RUSSELL C. FERICKS [3793]
STEVEN H. BERGMAN [13641]
KRISTINA H. RUEDAS [14306]
RICHARDS BRANDT MILLER NELSON
*Attorneys for Defendants & Counterclaimant*
Wells Fargo Center, 15th Floor
299 South Main Street
P.O. Box 2465
Salt Lake City, Utah  84110-2465
Email: russell-fericks@rbmn.com
          steven-bergman@rbmn.com
          kristina-ruedas@rbmn.com
Telephone: (801) 531-2000
Fax No.: (801) 532-5506

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| NOBLE GATE INDUSTRIAL (SHENZHEN) CO., LTD.,<br><br>        Plaintiff,<br><br>vs.<br><br>CIRTRAN BEVERAGE CORP., et al.,<br><br>        Defendants. | **CIRTRAN BEVERAGE CORP.'S AND PLAY BEVERAGES, LLC'S FIRST AMENDED ANSWER AND COUNTERCLAIM**<br><br><br>Case No. 2:14-cv-00132-TS<br><br>Judge Ted Stewart |
| CIRTRAN BEVERAGE CORP.,<br><br>        Counterclaimant,<br><br>vs.<br><br>NOBLE GATE INDUSTRIAL (SHENZEN) CO. LTD.,<br><br>        Counterclaim Defendant. | |

## FIRST AMENDED ANSWER

Defendant and Counterclaimant CirTran Beverage Corp. ("CirTran") and Defendant Play Beverages, LLC ("Play Beverages"), by and through their counsel of record, Russell C. Fericks, Steven H. Bergman and Kristina H. Ruedas of and for the law firm RICHARDS BRANDT MILLER NELSON, respectfully submit this First Amended Answer and Counterclaim.

CirTran and Play Beverages generally deny each and every claim of Plaintiff Noble Gate Industrial (Shenzhen) Co., Ltd. ("Noble Gate") and specifically deny that Plaintiff is entitled to any relief against CirTran or Play Beverages. Except as specifically admitted below, CirTran and Play Beverages deny each and every allegation of the Complaint.

CirTran and Play Beverages answer Noble Gate's Complaint as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Paragraph 1 of the Complaint contains legal conclusions as to which no response is required. To the extent a response is required, CirTran and Play Beverages admit that Paragraph 1 of the Complaint quotes excerpts of certain statutes.

2.     CirTran and Play Beverages admit the allegations of Paragraph 2 of the Complaint upon information and belief.

3.     CirTran and Play Beverages admit the allegations contained in Paragraph 3 of the Complaint.

4.     CirTran and Play Beverages admit the allegations contained in Paragraph 4 of the Complaint.

5.      CirTran and Play Beverages deny the allegations contained in Paragraph 5 of the Complaint.

6.      CirTran and Play Beverages deny the allegations contained in Paragraph 6 of the Complaint.

7.      CirTran and Play Beverages admit that the Agreement attached to the Complaint was executed in Utah.  CirTran and Play Beverages deny the remaining allegations contained in Paragraph 7 for lack of knowledge, information and belief.

8.      CirTran and Play Beverages admit the allegations contained in Paragraph 8 of the Complaint.

9.      Paragraph 9 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, CirTran and Play Beverages admit that Plaintiff has claimed damages in excess of $75,000 but deny that Plaintiff is entitled to any relief against CirTran or Play Beverages.

10.     Paragraph 10 of the Complaint contains a legal conclusion to which no response is required.

11.     CirTran and Play Beverages deny the allegations contained in Paragraph 11 of the Complaint for lack of knowledge, information or belief.

12.     CirTran and Play Beverages incorporate by reference their responses in this Answer as if set forth herein.

13.     CirTran and Play Beverages incorporate by reference their responses in this Answer as if set forth herein.

## GENERAL ALLEGATIONS

14. CirTran and Play Beverages admit Paragraph 14 of the Complaint.

15. CirTran and Play Beverages admit Paragraph 15 of the Complaint.

16. CirTran and Play Beverages admit that Plaintiff's exclusive distributorship was to remain in effect for an initial ten year term subject to Plaintiff performing all required obligations under the Agreement, which Plaintiff failed to do. CirTran and Play Beverages admit the remaining allegations contained in Paragraph 16 of the Complaint.

17. CirTran and Play Beverages admit that CirTran was to receive royalty payments for the first contract year in the amounts described by Plaintiff in Paragraph 17 of the Complaint, and admit that there was no minimum volume requirement for the First Contract Year. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 17 of the Complaint for lack of knowledge, information and belief.

18. CirTran and Play Beverages admit the parties discussed amending the Agreement but deny that the Agreement was amended in writing signed by all parties as required under the Agreement. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 18 of the Complaint.

19. CirTran and Play Beverages admit that Exhibit 3 shows a wire transfer in the total amount of $250,000. CirTran and Play Beverages deny the remaining allegations of Paragraph 19 of the Complaint for lack of knowledge, information and belief.

20. CirTran and Play Beverages deny Plaintiff's characterization of the litigation between CirTran, Play Beverages, and Playboy and state that the pleadings on file in Illinois

state court are the best reference for the litigation between CirTran, Play Beverages, and Playboy. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 20 of the Complaint for lack of knowledge, information or belief.

21.     CirTran and Play Beverages admit the allegations contained in Paragraph 21 of the Complaint.

22.     CirTran and Play Beverages admit that Playboy made the claim alleged in Paragraph 22 of the Complaint but deny that it was accurate. The United States Bankruptcy Court for the District of Utah entered an order on June 29, 2011, holding that Playboy's purported termination letter was not effective and that the Playboy License remained in effect.

23.     CirTran and Play Beverages admit the allegations contained in Paragraph 23 of the Complaint.

24.     CirTran and Play Beverages admit that Play Beverages and Playboy agreed to an extension of the Playboy License. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 24 of the Complaint.

25.     CirTran and Play Beverages admit that Play Beverages and Playboy entered into a second extension of the Playboy License and state that the extension speaks for itself. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 25 of the Complaint.

26.     CirTran and Play Beverages admit that Play Beverages and Playboy executed a new license agreement. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 26 of the Complaint.

27.     CirTran and Play Beverages deny the allegations contained in Paragraph 27 of the Complaint.

28.     CirTran and Play Beverages admit the allegations contained in Paragraph 28 of the Complaint.

29.     CirTran and Play Beverages admit that they have sued Playboy in Illinois state court.  CirTran and Play Beverages deny the remaining allegations contained in Paragraph 29 of the Complaint.

30.     CirTran and Play Beverages deny the allegations contained in Paragraph 30 for lack of knowledge, information and belief.

31.     CirTran and Play Beverages deny the allegations contained in Paragraph 31 for lack of knowledge, information and belief.

32.     CirTran and Play Beverages deny the allegations contained in Paragraph 32 for lack of knowledge, information and belief.

33.     CirTran and Play Beverages deny the allegations contained in Paragraph 33 for lack of knowledge, information and belief.

34.     CirTran and Play Beverages admit that CirTran terminated the Agreement due to Plaintiff's uncured default and breaches of the Agreement.  CirTran and Play Beverages deny the remaining allegations contained in Paragraph 34 of the Complaint.

## FIRST CAUSE OF ACTION
## BREACH OF WRITTEN CONTRACT
### (Against All CirTran and Play Beverages)

35.     CirTran and Play Beverages incorporate by reference Paragraphs 1 through 34 of this Answer as if set forth herein.

36.     CirTran and Play Beverages admit that pursuant to the terms of the Agreement, CirTran granted Plaintiff certain rights.  CirTran and Play Beverages deny the remaining allegations contained in Paragraph 36 of the Complaint.

37.     CirTran and Play Beverages deny the allegations contained in Paragraph 37 of the Complaint, including all subparts.

38.     CirTran and Play Beverages deny the allegations contained in Paragraph 38 of the Complaint.

39.     CirTran and Play Beverages deny the allegations contained in Paragraph 39 of the Complaint and deny that Plaintiff is entitled to any relief from CirTran and/or Play Beverages.

## SECOND CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against All CirTran and Play Beverages)

40.     CirTran and Play Beverages incorporate by reference Paragraphs 1 through 39 of this Answer as if set forth herein.

41.     Paragraph 41 of the Complaint contains legal conclusions as to which no response is required.

42.     CirTran and Play Beverages deny the allegations contained in Paragraph 42 of the Complaint for lack of knowledge, information or belief.

43.     CirTran and Play Beverages deny the allegations contained in Paragraph 43 of the Complaint, including all subparts.

44.     CirTran and Play Beverages deny the allegations contained in Paragraph 44 of the Complaint.

45.     CirTran and Play Beverages deny the allegations contained in Paragraph 45 of the Complaint and deny that Plaintiff is entitled to any relief against CirTran and/or Play Beverages.

### THIRD CAUSE OF ACTION
### INTENTIONAL MISREPRESENTATION
### (Against All CirTran and Play Beverages)

46.     CirTran and Play Beverages incorporate by reference Paragraphs 1 through 45 of this Answer as if set forth herein.

47.     CirTran and Play Beverages deny the allegations contained in Paragraph 47 of the Complaint, including all subparts.

48.     CirTran and Play Beverages deny the allegations contained in Paragraph 48 of the Complaint.

49.     CirTran and Play Beverages admit that CirTran entered an appearance in the Play Beverages bankruptcy proceeding and that CirTran is suing Playboy in Illinois state court. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 49 of the Complaint.

50.     CirTran and Play Beverages deny the allegations contained in Paragraph 50 of the Complaint.

51.     CirTran and Play Beverages deny the allegations contained in Paragraph 51 of the Complaint for lack of knowledge, information and belief.

52.     CirTran and Play Beverages deny the allegations contained in Paragraph 52 of the Complaint and deny that Plaintiff is entitled to any relief against CirTran and/or Play Beverages.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
**(Against All CirTran and Play Beverages)**

53.     CirTran and Play Beverages incorporate by reference Paragraphs 1 through 52 of this Answer as if set forth herein.

54.     CirTran and Play Beverages deny the allegations contained in Paragraph 54 of the Complaint, including all subparts

55.     CirTran and Play Beverages deny the allegations contained in Paragraph 55 of the Complaint.

56.     CirTran and Play Beverages admit that CirTran entered an appearance in the Play Beverages bankruptcy proceeding and that CirTran is suing Playboy in Illinois state court. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 56 of the Complaint.

57.     CirTran and Play Beverages deny the allegations contained in Paragraph 57 of the Complaint.

58.     CirTran and Play Beverages admit that CirTran entered an appearance in the Play Beverages bankruptcy proceeding and that CirTran and Play Beverages have sued Playboy in

Illinois state court. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 58 of the Complaint for lack of knowledge, information and belief.

59. CirTran and Play Beverages admit that CirTran was supposed to receive royalty payments under the Agreement. CirTran and Play Beverages further state that CirTran did not receive the royalties pursuant to the Agreement because of Plaintiff's breach of the Agreement. CirTran and Play Beverages deny the remaining allegations contained in Paragraph 59 of the Complaint.

60. CirTran and Play Beverages deny the allegations contained in Paragraph 60 of the Complaint for lack of knowledge, information and belief.

61. CirTran and Play Beverages deny the allegations contained in Paragraph 61 of the Complaint and deny that Plaintiff is entitled to any relief against CirTran and/or Play Beverages.

## FIFTH CAUSE OF ACTION
## FRAUDULENT INDUCEMENT AND CONCEALMENT
### (Against All CirTran and Play Beverages)

62. CirTran and Play Beverages incorporate by reference Paragraphs 1 through 61 of this Answer as if set forth herein.

63. CirTran and Play Beverages deny the allegations contained in Paragraph 63 of the Complaint.

64. CirTran and Play Beverages deny the allegations contained in Paragraph 64 of the Complaint.

65. CirTran and Play Beverages deny the allegations contained in Paragraph 65 of the Complaint for lack of knowledge, information and belief.

66.     CirTran and Play Beverages deny the allegations contained in Paragraph 66 of the Complaint.

67.     CirTran and Play Beverages deny the allegations contained in Paragraph 67 of the Complaint.

68.     CirTran and Play Beverages deny the allegations contained in Paragraph 68 of the Complaint for lack of knowledge, information and belief.

69.     CirTran and Play Beverages deny the allegations contained in Paragraph 69 of the Complaint.

70.     CirTran and Play Beverages deny the allegations contained in Paragraph 70 of the Complaint and deny that Plaintiff is entitled to any relief against CirTran and/or Play Beverages.

## JURY REQUEST

71.     CirTran and Play Beverages do not object to the request contained in Paragraph 71 of the Complaint.

72.     Except as expressly admitted above, CirTran and Play Beverages deny each and every allegation contained in the Complaint and deny that Plaintiff is entitled to any relief against CirTran and/or Play Beverages.

## AFFIRMATIVE DEFENSES

CirTran and Play Beverages allege the following affirmative defenses to Plaintiff's claims.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a cause of action against CirTran and/or Play Beverages upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract fail for failure of consideration.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims for rescission of contract fail for lack of consideration.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract fail for lack of specificity and the failure of the parties to reach a meeting of the minds sufficient to form an objective understanding as to the terms and conditions, and the rights and responsibilities, in the alleged Extension Guarantee.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, under the doctrine of accord and satisfaction through Plaintiff's acceptance of payments, goods, services, and/or other benefits provided by CirTran and/or Play Beverages.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because CirTran and/or Play Beverages have made all payments or provided all goods, services, and/or other benefits owed to Plaintiff.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, under the doctrine of novation in that Plaintiff and CirTran and Play Beverages agreed to new and different terms to the Agreement between the parties.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, as Plaintiff has, affirmatively or by omission, waived its right to recovery against CirTran and/or Play Beverages.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because of Plaintiff's own breach of contract.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, under the first breach doctrine.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, by Plaintiff's own lack of performance under the alleged contract.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract are barred, in whole or in part, because CirTran and Play Beverages have not breached any provision of the Agreement.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, by the doctrines of impossibility or frustration of purpose.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because Plaintiff has not been damaged by any action or inaction of CirTran and/or Play Beverages.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, by the doctrine of release.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, due to Plaintiff's own lack of diligence or Plaintiff's lack of reliance.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, by the doctrines of recoupment and offset because Plaintiff's damages, if any, are more than offset by the damages Plaintiff owes to CirTran and/or Play Beverages for Plaintiff's breaches of the Agreement.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, by Plaintiff's failure to mitigate damages. Further, Plaintiff's claims for relief are barred, in whole or in part, to the extent that Plaintiff has mitigated its damages, if any.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because neither CirTran nor Play Beverages proximately caused the damages, if any, Plaintiff is claiming in the Complaint. Plaintiff's damages, if any, were caused by its own actions or inactions and those of its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Plaintiff.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff's alleged damages, if any, were caused by persons or parties over whom CirTran and/or Play Beverages have no control or right of control, and for whom CirTran and/or Play Beverages are not legally responsible.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Pursuant to the provisions of the Utah Liability Reform Act, Utah Code Ann. §§ 78B-5-817 *et seq.,* CirTran and Play Beverages can only be held liable to Plaintiff in an amount proportionate to their degree or percentage of fault, if any.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The damages, if any, suffered by Plaintiff, were caused, in whole or in part, by its own conduct; consequently, Plaintiff's claims, if any, are barred or must be proportionately reduced to the extent of the comparative fault of Plaintiff, under and pursuant to the provisions of the Utah Liability Reform Act, Utah Code Ann. §§ 78B-5-817, *et seq.*

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's damages, if any, were proximately caused by an unforeseeable, independent, intervening, or superseding cause or event beyond the control and unrelated to any conduct of CirTran and/or Play Beverages.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint and the claims for relief therein should be dismissed or stayed for failure to join one or more necessary and indispensable parties.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

To whatever extent Plaintiff's claims are based on a theory providing for liability without proof of causation and direct liability by CirTran and/or Play Beverages, these claims are contrary to applicable law and violate CirTran's and Play Beverage's rights under the United States and Utah Constitutions.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claim for relief based on fraud or misrepresentation must be dismissed because Plaintiff has not alleged fraud or misrepresentation with particularity as required by Fed R. Civ. P. 9(b).

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claim for punitive and/or exemplary damages is barred by the Eighth Amendment of the United States Constitution and Article I, Section 9 of the Utah Constitution to the extent Plaintiff's claim for punitive and/or exemplary damages constitutes the imposition of an excessive fine on CirTran and/or Play Beverages.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because Plaintiff lacks standing to bring or maintain an action in the State of Utah.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because Plaintiff is not the real party in interest.

CirTran and Play Beverages reserve the right to amend this First Amended Answer if they learn of additional defenses through discovery or further investigation.

/

/

/

/

/

/

/

## COUNTERCLAIM

As Counterclaim Plaintiff, CirTran Beverage Corp. ("CirTran") hereby asserts the following claims against Counterclaim Defendant Noble Gate Industrial (Shenzhen) Co., Ltd. ("Noble Gate"):

1.      Playboy Enterprises International, Inc. ("Playboy") is the owner of the right to use the name "Playboy" and the rabbit head design (the "Playboy Trademarks") in connection with many territories worldwide including in China, Hong Kong, and Macau.

2.      In November of 2006, Playboy and Play Beverages, LLC ("Play Beverages") entered into a License Agreement (the "Underlying License") whereby Play Beverages was granted the right to distribute, either directly or through other distributors, non-alcoholic energy drinks and water bearing the Playboy Trademarks in many territories including China, Hong Kong, and Macau.

3.      On August 21, 2007, Play Beverages and CirTran entered into an Amended and Restated Exclusive manufacturing, Marketing and Distribution Agreement whereby CirTran was granted certain manufacturing and distribution rights under the November 2006 License Agreement.  At all relevant times, Play Beverages continued to have the right to distribute, either directly or through other distributors such as CirTran, non-alcoholic energy drinks and water bearing the Playboy Trademarks.

4.      On June 1, 2012, CirTran, and Noble Gate entered into a Manufacturing and Distribution Agreement (the "Agreement"), attached hereto as Exhibit A, whereby Noble Gate

was to act as an exclusive seller and distributor of the licensed non-alcoholic energy drinks in China, Hong Kong, and Macau.

5.      Pursuant to the Agreement, the Minimum Royalty due for the second year was $600,000, to be paid by June 1, 2013.

6.      In February 2013, the Agreement was amended to add water and flavored water to the scope of the manufacturing and distribution license. *See* Amendment 1 ("Amendment"), attached hereto as Exhibit B.  The Amendment was executed on behalf of Noble Gate by Walid El-Badaoui, who represented that he w as a Director of Noble Gate.

7.      The Amendment extended the Effective Date to April 1, 2013 for commencement of the Minimum Sales requirements under Section 4.5 of the Agreement.  The Amendment also granted Noble Gate a $250,000 credit toward the Minimum Royalty due for the second year of the Agreement, per Schedule 6.  In exchange, Noble Gate agreed to advance the due date for the payment of the annual Minimum Royalty to the last business day (March 29, 2013) before the new Effective Date, April 1, 2013.

8.      Mr. El-Badaoui paid the $100,000 royalty for the additional water and flavored water license, and added $50,000 towards payment of the 2013 Minimum Royalty under the original Agreement.  With the $250,000 credit, this left a $200,000 balance for the Minimum Royalty which was then due on March 29, 2013.

9.      Noble Gate failed to pay the $200,000 balance by March 29, 2013.

10.     Noble Gate continues to refuse to remit payment of the balance of the Minimum Royalty of $200,000 that was due on March 29, 2013.

11.    The Agreement provides: "Either Party may terminate this Agreement if the other party (including its subcontractors and distributors) fails to pay for Products or Royalties when due and such default is not cured within 10 days of written notice from the other party." *See* Ex. A at § 4.4(a).

12.    Because Noble Gate did not make its minimum royalty payment, CirTran provided written notice of Noble Gate's default on March 30, 2013.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

13.    CirTran realleges and incorporates herein by reference each allegation of Paragraphs 1 through 12 set forth in this Counterclaim.

14.    CirTran has performed all of the material conditions, covenants, obligations and promises required to be performed by it under the Agreement, other than such terms as Noble Gate has waived, excused, or is now estopped to assert, or those terms which Noble Gate's conduct and breaches rendered performance of impossible.

15.    Noble Gate is in material breach of its obligations under the Agreement. The material breaches of Noble Gate include the following:

    a.    Failing to pay the remaining balance of the Year 2 Minimum Royalty of $200,000 by March 29, 2013; and

    b.    Failing to commercially launch the products fully in all or substantially all channels in each country in the Territory.

16. Noble Gate's material breaches of the Agreement have caused CirTran to suffer damages. These damages are ongoing and continue to accrue, and for this reason cannot be quantified at this time but will be presented and proven at trial. These damages will include the $200,000 that Noble Gate failed to pay CirTran on March 29, 2013 plus additional lost royalties as a result of Noble Gate's breaches of the Agreement.

17. CirTran has been damaged in an amount to be determined at trial plus attorneys' fees and costs incurred in bringing this action.

**SECOND CAUSE OF ACTION**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

18. CirTran realleges and incorporates herein by reference each allegation of Paragraphs 1 through 17 set forth in this Counterclaim.

19. The Agreement and Amendment 1 constituted contracts between CirTran and Noble Gate and, as such, the Agreement and Amendment 1 contained implied covenants of good faith and fair dealing.

20. The agreed common purpose of the Agreement and Amendment 1 included the expectation that Noble Gate would commercially launch the products within the Territory as the exclusive seller and distributer of the products within the Territory.

21. The actions and inactions of Noble Gate and its officers and agents were not consistent with the agreed common purpose of the Agreement and Amendment 1 and the justified expectations of CirTran. These actions and inactions include the following:

  a. Failing to pay the remaining balance of the Year 2 Minimum Royalty of $200,000 by March 29, 2013; and

  b. Failing to commercially launch the products fully in all or substantially all channels in each country in the Territory.

22. By reason of its conduct, and the conduct of its officer and agents, including Walid El-Badaoui, Noble Gate has breached the implied covenant of good faith and fair dealing.

23. As a result of Noble Gate's breaches of the implied covenant of good faith and fair dealing, CirTran has been damaged in an amount to be determined at trial plus attorneys' fees and costs incurred in bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, CirTran and Play Beverages pray for relief as follows:

1. That the Court dismiss Plaintiff's Complaint with prejudice as to CirTran and Play Beverages and enter judgment in favor of CirTran and Play Beverages;

2. That the Court deny Plaintiff damages of any kind;

3. That the Court deny Plaintiff's claims for attorneys' fees and costs;

4. That the Court deny Plaintiff's claims for any other type of relief;

5. That the Court award CirTran and Play Beverages their costs, and if applicable, their attorneys' fees incurred defending this action;

6. For an award of damages for CirTran's Counterclaim in an amount to be determined at trial, including, but not limited to, the $200,000 balance of the Minimum Royalty due for the second year of the Agreement.

7.     For reasonable attorneys' fees and costs incurred in bringing CirTran's

Counterclaim;

8.     For costs of suit in bringing this Counterclaim; and

9.     For such further and other relief as the Court deems proper.

DATED this 12th day of May, 2014.

RICHARDS BRANDT MILLER NELSON


*/s/ Kristina H. Ruedas*
RUSSELL C. FERICKS
STEVEN H. BERGMAN
KRISTINA H. RUEDAS
*Attorneys for Defendant and Counterclaimant*
*CirTran Beverage Corp. and Defendant Play*
*Beverages, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of May, 2014, I electronically filed the foregoing **CIRTRAN BEVERAGE CORP.'S AND PLAY BEVERAGES, LLC'S FIRST AMENDED ANSWER AND COUNTERCLAIM** with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

James E. Harward
W. Earl Webster
HARWARD & ASSOCIATES
10542 South Jordan Gateway, Suite 300
South Jordan, UT 84095
*Attorneys for Plaintiff*

Ali Parvaneh
James S. Sifers
MADISON HARBOR ATTORNEYS
17702 Mitchell North
Irvine, CA 92614
*Attorneys for Plaintiff – Pro Hac Vice*

*/s/ Kristina H. Ruedas*

EXHIBIT A

# MANUFACTURING AND DISTRIBUTION AGREEMENT

This Manufacturing and Distribution Agreement (the "Agreement") dated as of June 1, 2012 (the "Effective Date"), is by and between **CirTran Beverage Corp.**, a Utah corporation located at 4125 South 6000 West, West Valley City, UT 84128, USA (the "Company") and **Play Beverages, LLC** ("Play Beverages"); and **Noble Gate Industrial (Shenzhen) Co., Ltd.** with its principal place of business at 3206 Building #2 Zhongshan Garden, Huii Rd., Shenzhen, China (the "Distributor"). This Agreement supersedes all Agreements signed between and among the parties.

## RECITALS:

A.     WHEREAS the Company is engaged in the business of manufacturing, advertising, marketing, distributing, and selling certain Playboy brand beverages (the "Products," as further defined below); and

B.     WHEREAS Play Beverages, LLC ("Play Beverages"), and Playboy Enterprises International, Inc. ("Playboy") have entered into a Product License Agreement (as subsequently supplemented and amended, the "Playboy License") dated as of November 1, 2006, pursuant to which Playboy has licensed the use of the Trademarks on the Products; and

C.     WHEREAS Play Beverages entered into an Amended and Restated Exclusive Manufacturing, Marketing and Distribution Agreement dated as of August 21, 2007, with the Company to grant certain exclusive manufacturing and distribution rights under the Playboy License (the "Play Beverages Agreement").

D.     WHEREAS the Company and Distributor desire that the Distributor act as the exclusive seller and distributor of the Products in the Territory as defined below.

NOW, THEREFORE, upon these premises, it is hereby agreed as follows:

## AGREEMENTS:

In consideration of the mutual covenants and agreements contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     DEFINITIONS. As used in this Agreement, the following capitalized terms shall have the meanings indicated below.

    1.1     "Business Day" means any day, other than Saturday or Sunday, on which commercial banks in the United States of America are open for business.

    1.2     "Company IP" includes all Trademarks (other than the Playboy Trademarks), know-how, formulae, trade secrets, text, images, other copyrighted materials, and any other intellectual property owned by the Company and provided by it to Distributor for use in connection with manufacturing or marketing the Products in the Territory.

    1.3     "Confidential Information" means any proprietary and confidential information of either party, including recipes, formulae, trade secrets, know-how, the substantive terms of this



1

Agreement, non-public business and financial information, marketing and operating methods, any written materials marked as confidential and any other information, including visual or oral information, which reasonably should be understood to be confidential. Confidential Information does not include information that a party can prove: (a) is now or later becomes generally available to the public without fault of the party who received such information ("Recipient") from the other party ("Discloser"); (b) was rightfully in Recipient's possession prior to its disclosure by Discloser; (c) is independently developed by Recipient without the use of any Confidential Information of Discloser; (d) is obtained by Recipient without obligation of confidentiality from a third party who has the right to disclose it; or (e) is required to be disclosed pursuant to a judicial or legislative order or proceeding; provided that Recipient provides to Discloser prior notice of the intended disclosure and an opportunity to respond or object to the disclosure.

1.4    "E-Commerce Web Site" means promoting, offering, providing or selling the Products using or via communications involving the TCP/IP Protocol or any TCP/IP Successor.

1.5    "Earned Royalties" has the meaning set forth in Schedule 6.

1.6    "Minimum Royalty" means the minimum annual payments set forth in Schedule 6.

1.7    "Minimum Sales Requirements" has the meaning set forth in Schedule 4.

1.8    "Mobile Commerce" means transactions conducted by Distributor on one or more mobile telecommunications networks exclusively within the Territory in Mobile Device presentations associated with the Playboy Trademarks.

1.9    "Mobile Device" means a mobile, wireless device (now existing or developed hereafter) that (i) is intended to be mobile and not commonly used at a fixed location; and (ii) is capable of receiving voice, data, and/or video communications. The definition of Mobile Device includes, without limitation, personal digital assistants (PDAs), pagers, mobile phones and other devices receiving communications via wireless fidelity (wi-fi) network and, for the avoidance of doubt, excludes all non-mobile television devices or other devices that function as a receiver or set-top box for a television-type broadcast or other signal, fixed display device or fixed monitor.

1.10    "Net Sales" means units of Product distributed by Distributor (either cans or cases, as applicable), less returns and a reasonable number of units of Product distributed for free for promotional purposes.

1.11    "Playboy Trademarks" means the Trademarks that are owned by Playboy or its affiliates and licensed to the Company for use on the Products.

1.12    "Products" means only the Playboy brand non-alcoholic beverages listed in the attached Schedule 1, as it may be amended from time to time by the Company.

1.13    "TCP/IP Protocol (Transmission Control Protocol/Internet Protocol)" means the two-layered program that is the basic communication language or protocol of publicly accessible computer networks such as the Internet and private computer networks such as intranets and extranets.




1.14 "TCP/IP Successors" means programs, languages, protocols or other technical means that are being developed or that have yet to be developed that are intended to supplement, supersede or replace TCP/IP or its use for communications on computer networks.

1.15 "Term" means the Initial Term and the Renewal Term, as such terms are defined in Section 4.1.

1.16 "Territory" means those countries listed in Schedule 2 attached hereto.

1.17 "Trademarks" means the trademarks and trade names set forth in the attached Schedule 3, including the Business Name (as defined in Section 2.3(b)). "Trademarks" includes the Playboy Trademarks for so long as Company and Distributor are authorized by Playboy to use the Playboy Trademarks. Trademarks may also include other trademarks or trade names developed by the Company for use on or with the Products from time to time, if the parties agree to add such trademarks or trade names by amending Schedule 3.

2. APPOINTMENT AND LICENSE GRANTS.

2.1 Appointment. The Company hereby appoints the Distributor as its exclusive (as set forth in Section 2.5) distributor for the Products in the Territory.

2.2 Playboy Consent. As of the Effective Date, Playboy has given approval to all of the countries included in the Territory subject to final clearance and approval.

2.3 Trademarks.

(a) The Company hereby grants to the Distributor the nonexclusive, non assignable, nontransferable right to use the Trademarks, solely in connection with the distribution, marketing, and sale of the Products in the Territory. The Trademarks will remain the sole and exclusive property of the Company or its licensors. Distributor will have no right to use the Trademarks other than in connection with distribution, marketing and sale of the Products in the Territory. Distributor's use of the Playboy Trademarks will be subject to the restrictions imposed by Playboy and of which Distributor has received notice. Distributor has no right to open or operate a free-standing retail store using the Playboy Trademarks or any other intellectual property of Playboy on or in connection with such store or the signage for such store. The right and license granted to the Distributor hereunder shall not include the right to use and Distributor shall not use the Trademarks in its corporate or business name or in any fictitious name, except as provided in Section 2.3(b).

(b) During the Term of this Agreement, the Company and Distributor agree that Distributor may use the name "PlayBev" (the "Business Name") as a trade name and in its business name, subject to compliance with local legal and governmental requirements. The Company agrees that the Business Name may be used on Distributor's letterhead, business cards, marketing materials, contracts with customers, etc. Upon termination of this Agreement, the right to use the Business Name shall revert automatically to the Company. Distributor agrees to execute all instruments or documents reasonably required to transfer all its rights in the Business Name to the Company upon termination of this Agreement or termination of Distributor's right to use, or actual use of, the Business Name, and Distributor agrees to cease all use of the Business Name in its business at such time. The parties agree to cooperate with regard to the preparation and filing of any applications, filings, renewals or other documentation necessary or



3

useful to protect the Company's intellectual property rights in the Business Name in the Territory.

(c)  Use of Trademarks. Distributor shall comply with the Company's policies and guidelines for use of the Trademarks, including the Business Name (see Schedule 7 as attached), and with Playboy's policies and guidelines for use of the Playboy Trademarks (including those attached as Schedule 5), as such policies and guidelines may be issued and revised from time to time, and Distributor shall comply with proper legal standards. The initial or most prominent use of a Trademark in all materials shall be followed by the appropriate trademark symbol (® or TM). The owner of the Trademark will be identified and Distributor shall claim the right to use thereof only as an authorized licensee. Distributor acknowledges that the good will and value of the Trademarks may be adversely affected unless the Product and marketing and promotional materials that use any licensed Trademark meet the quality standards of the Company and Playboy. Upon written request from either the Company or Playboy, Distributor shall, within 10 Business Days, submit to the Company or Playboy for review samples of requested Products or marketing materials that make use of the Trademarks. If so requested in writing, Distributor shall make any reasonable changes to such materials.

(d)  Distributor agrees and acknowledges that: (i) the Playboy Trademarks are properties of Playboy , and when used upon merchandise means that such merchandise is sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Distributor will not sell, ship or otherwise dispose of any such merchandise except according to the terms of this Agreement; and (iii) Distributor will never make, cause others to make or assist others in making, any claim whatsoever to any or all of the Playboy Trademarks or any trademark, image, designation, name, phrase, design or symbol similar thereto in connection with the manufacture, advertising, promotion, sale or distribution of merchandise.

(e)  Distributor will, upon reasonable request from the Company or Playboy, deliver to the Company or will destroy in the presence of the Company or its representative(s), all molds, designs or any other elements used in reproducing any or all of the Trademarks.

2.4  Quality Standards and Inspection. Distributor acknowledges that the good will and value of the Trademarks and the Products may be adversely affected unless the Products offered by Distributor in connection with the Trademarks are at least equivalent in quality to products and services provided directly by the Company, and Distributor agrees to maintain such quality standards. Upon request, Distributor will allow the inspection by the Company and Playboy of the portions of the Distributor's facilities used in connection with the manufacture, storage and distribution of the Products in order to confirm that the Products and such facilities meet quality standards. Such review may occur from time to time upon request and during regular business hours. The Company or Playboy may notify Distributor of any specific, reasonable objections to the quality of Products and services provided by Distributor in connection with the Trademarks. Distributor shall attempt, acting reasonably and in good faith, to promptly resolve any such objections to the satisfaction of the Company and Playboy. If Distributor is unable or unwilling to resolve any such objections within a reasonable time, not to exceed 30 days unless otherwise agreed by the parties, this Agreement may be terminated for default.

2.5  Distribution Channels. Distributor acknowledges and agrees that in order to maintain the quality of the Product as perceived by the public, it will sell and distribute Products only to those stores or web sites that are generally perceived by the public as good quality stores or web sites by virtue of their reputations for quality products and services, including customer

4

service desks, regular, full-time service representatives, and provision for return of products. Distributor agrees that warehouse outlets, deep discount chains and other similar channels will not be considered acceptable channels of sale and distribution under this Agreement. The distribution channels will be submitted for approval with the Marketing Program as more fully described in Section 5.9 of this Agreement.

2.6     Manufacturing of Product.

(a)     The Company hereby grants to Distributor, and Distributor accepts, a non-exclusive license, under the Company IP to make and have made the Products at facilities within or outside the Territory, for distribution in the Territory, subject to all the terms and conditions of this Agreement. Distributor will not obtain any rights to the Product formula. Distributor agrees that the Products shall be manufactured pursuant to and shall comply with the specifications provided by the Company and that Distributor shall not deviate from such specifications without the Company's prior written consent. All manufacturing must be performed in accordance with the highest commercial standards for premium beverage products, and in accordance with all applicable legal and regulatory requirements for the Territory. The Company has the right to (i) approve or disapprove each manufacturing facility proposed by Distributor (whether Distributor's own facility or those of a third party manufacturer), in its sole discretion, prior to such manufacturing facility being used to manufacture Product; upon request, the Company will provide acceptable guidelines and specifications for construction prior to construction of a manufacturing facility; (ii) to monitor and inspect the manufacture of the Product (whether at Distributor's own facilities or those of third party manufacturers); (iii) to disapprove any Products that do not meet its reasonable quality standards; and (iv) to withdraw its approval for any manufacturing facility that is not meeting the Company's reasonable quality standards, which shall be consistent with industry standards for similar manufacturing facilities. The Company agrees not to unreasonably withhold or delay approval of a manufacturing facility; however, the parties acknowledge that Playboy's approval is also required and is discretionary.

(b)     Distributor agrees that no production, manufacture or distribution of any Products will commence until this Agreement has been signed, dated and returned by Distributor to the Company and the royalty due is paid in full. Distributor further agrees that during the Term or any renewal thereafter, it will not produce, cause to be produced or assist in the production of any product or item not specifically requested by the Company using any or all of the Trademarks or any trademarks, images, designations, names, phrases, designs or symbols similar to any or all of the Trademarks.

(c)     Except as otherwise agreed, Distributor must purchase Products from Company's approved sub-contractors or from another manufacturer as requested by Distributor and approved by the Company. Distributor is free to enter into separate agreements with the Company's sub-contractors or other approved manufacturers to purchase the Products so long as the terms of such agreements conform to and do not violate the terms of this Agreement.

2.7     Exclusivity. During the Term, Distributor will have the exclusive right to sell and distribute Products within the Territory, except as follows:

(a)     Playboy has retained the right (i) to sell or license others to sell Products in the Territory to any U.S. military bases and possessions and duty-free outlets; (ii) to produce or have produced the Products to be used in the Territory specifically for promotional and advertising purposes and not for sale; (iii) the right to produce or have produced any Products for the advertisement, promotion, sale and distribution, in the Territory, through direct marketing

5





channels or sales (including, but not limited to, direct mail, catalog houses, home shopping programs, infomercials and the like), premium sales, incentive sales, home party plans or through any other means now known or hereafter available; (iv) to produce, have produced, advertise, distribute and sell any Products or similar products through a Playboy-branded retail store located in the Territory; or (v) to produce or have produced any Products for the advertisement, promotion, sale and distribution of Products in the Territory via any E-Commerce Web Site or via Mobile Commerce. Any Products advertised, promoted, sold or distributed by Playboy or its subsidiary or affiliated companies for the purposes set forth in subsections (iii), (iv) or (v) above shall be obtained only from Distributor at the lowest prices offered to other purchasers of the Products ordering similar quantities; provided, however, that in the event Distributor cannot fulfill such orders at such low prices or in the quantities or within the time frames needed, Playboy (or its subsidiary or affiliate) may seek fulfillment of the relevant orders through one or more third parties without liability or obligation to Distributor. With respect to subsection (iv), Playboy has also reserved the right to source the Products or similar products from any third party anywhere in the world and sell such Products or similar products through a Playboy-branded store in the Territory, without violation of this Agreement.

(b) Additionally, either the Company or Playboy may manufacture Product in the Territory solely for export to countries outside of the Territory. At the Company's request, Distributor will reasonably assist in facilitating discussions between the Company and Distributor's manufacturers for the Company to purchase Products from such manufacturer(s) for sale by the Company outside of the Territory. Distributor agrees that the Company shall be permitted to purchase Products from Distributor's manufacturers for export purposes to countries outside the Territory; provided that Distributor's Products needs from such manufacturer shall have priority over the Company's needs.

2.8 Localization of Products. Company will consider in good faith requests from Distributor to change the formula, taste, color or form factor of the Products to better match local tastes in the Territory. In Company's discretion, such localized Products may be in addition to, or in replacement of, the initial Products. Nothing herein shall grant to Distributor the right to make modifications or changes to the Products and Distributor shall not make any modifications or changes to the Products without the prior written consent of the Company.

2.9 Product Samples. At the Distributor's cost, Distributor agrees that before commencing production of the Products and before marketing, distributing or selling any Products, Distributor will send to the Company representative samples of the Products manufactured by or for Distributor in quantities reasonably requested by the Company, not to exceed 2 cases, for advance written approval by the Company and Playboy (the "Approval"). The Company shall have fifteen (15) Business Days to approve the samples. If the Company approves the samples, Distributor can begin manufacturing and distributing the Products. If the Company does not approve the samples, then Distributor shall make the modifications or corrections requested by the Company and submit revised samples to the Company for approval. This paragraph shall not apply to Products purchased from the Company's subcontractors listed in Section 2.6(c) above.

3. INTELLECTUAL PROPERTY

3.1 Ownership: No Contest. Distributor acknowledges that, as between Distributor and the Company, the Company owns all intellectual property rights in and to the Products, the Trademarks and the Company IP. Distributor shall not contest the Company's or its licensors' rights to the Trademarks or Company IP, or do anything that would jeopardize or diminish their

2030129_1




value in any respect and Distributor hereby assigns to the Company any rights it may obtain in the Trademarks or Company IP. All goodwill accrued through use of the Trademarks by Distributor, its sub-distributors, agents and employees shall inure to the benefit of the Company and its licensors. Nothing in this Agreement shall give Distributor any right, title or interest in the Business Name or other Trademarks, other than the right to use them in accordance with this Agreement. Distributor further acknowledges and agrees that, as between Distributor and the Company, the Company shall retain all copyrights to any Products marketing materials modified by Distributor (including, for purposes of clarity, translated works), and Distributor hereby assigns to The Company all its copyrights in such work.

3.2     Modifications. The parties agree that all modifications, translations, and other derivative works of the Products, advertising and promotional materials, or other Company IP made by Distributor and its employees and independent contractors hereunder (collectively, "Modifications") shall be considered a "work made for hire" under copyright law, and that all right, title, and interest in such Modifications is and shall be owned by the Company. To the extent such work for hire doctrine is inapplicable for any reason, in consideration of the rights and licenses granted to Distributor under this Agreement, Distributor hereby irrevocably assigns to the Company any and all of its right, title and interest in and to such Modifications and agrees to execute any additional documents reasonably requested by the Company to evidence the Company's ownership of the same. Distributor shall enter into written contracts consistent with this Section 3.2 with employees and independent contractors who undertake Modifications on behalf of Distributor. All permitted Modifications created by Distributor or under its direction shall be subject to the license grant and other terms and conditions of this Agreement. Distributor will promptly notify the Company in writing of any significant Modifications developed by Distributor relating to the Products, and obtain the Company's written approval prior to any public use thereof (which is contingent upon Playboy's approval, which may be granted or withheld at Playboy's discretion). Company's approval will not be unreasonably withheld.

3.3     Third Party Infringements. Distributor shall notify the Company promptly of any infringements by third parties of the Trademarks, when being used in connection with similar products to the Products within the Territory, or the Company IP that come to Distributor's attention. If there is any third party infringement, the Company shall have the first option to bring any action for such infringement on behalf of itself and Distributor, and Distributor shall cooperate fully with the Company in such action; and in such event the Company shall bear the expenses of the action (including costs incurred by Distributor in taking any actions at the Company' request) and shall be entitled to retain any and all sums recovered in the action. If the Company declines in writing to bring any such action, and Distributor's rights under this Agreement are affected by such infringement, Distributor may proceed in the Company's name in order to protect its exclusive rights (except as to the Playboy Trademarks, as to which any actions taken must have the consent of Playboy). In such event, Distributor shall bear all expenses of the action (including costs incurred by the Company in taking any actions at Distributor's request), and shall retain any and all sums recovered in the action. Alternatively, the Company and Distributor may agree in writing to share the costs of a particular action and any sums recovered.

4.      TERM AND TERMINATION.

4.1     Term. This Agreement shall be effective as of the Effective Date and shall remain in force for an initial term of 10 years (the "Initial Term"), unless terminated prior thereto as provided herein.

7

4.2    Renewal Term.  If (i) Distributor has met its sales goals described in Section 4.5 for the Initial Term, subject to the parties agreement upon minimum sales requirements for the Renewal Term; (ii) Distributor has not notified the Company that it does not intend to renew this Agreement, which notice must be given at least 90 days prior to the expiration of the Initial Term; and (iii) the parties have agreed upon minimum sales requirements for the Renewal Term; this Agreement will renew for a second term of 5 years (the "Renewal Term") upon terms and conditions similar to this Agreement or as otherwise mutually agreed. It is a condition to any renewal of this Agreement that the parties agree in writing on new Minimum Sales Requirements, which requirements shall be commercially reasonable, for each year of the Renewal Term. The parties will consider, among other things, the saturation of the Products in the Territory and the overall growth rate of the Products throughout the Territory. The parties' agreement as to new Minimum Sales Requirements shall be in writing signed by both parties and must be agreed upon no later than thirty (30) days prior to the expiration of the then-current term, unless the parties mutually agree to extend such deadline.

4.3    Termination by Mutual Consent.  This Agreement may be terminated at any time by mutual consent of the parties in writing effective as provided herein.

4.4    Termination upon Default.  This Agreement may be terminated for uncured defaults as follows:

(a)    10 Day Cure Period – Non-Payment of Royalties or Product.  Company may terminate this Agreement if Distributor (including its subcontractors and distributors) fails to pay for Products from its subcontractors or Royalties when due and such default is not cured within 10 days of written notice from the Company.

(b)    30 Day Cure Period – All other Material Defaults.  Either party may terminate this Agreement for all other material breaches not cured within 30 days of written notice to the other party. If such act or omission cannot be cured within such 30 day period, and either party is diligently continuing efforts to attempt to cure such alleged act or omission, each party agrees to give such additional time as is reasonably necessary to cure (which time period shall not exceed 90 days unless agreed in writing by the non-breaching party).  In addition, it is understood that breaches of Distributor's Minimum Sales Requirements or Product launch commitments may occur because sales are delayed in order to comply with a regulation of a country within the Territory or an EU law, and additional reasonable time shall be granted to cure such defaults, provided that Distributor is diligently seeking to obtain such regulatory compliance or approval as soon as is reasonably feasible. Distributor acknowledges that Playboy is not bound by the preceding two sentences of this subsection (b); however, if Playboy notifies Distributor of a breach under this subsection, the Company agrees to use reasonable efforts to persuade Playboy to allow Distributor the extended time periods provided for in this subsection, if applicable.

(c)    No Cure Period – Discontinuing Services.  The Company may terminate this Agreement upon written notice if Distributor abandons its business by discontinuing normal service to its customers for a period of 45 consecutive days.

(d)    No Cure Period – Insolvency.  The Company may terminate this Agreement upon written notice if (i) Distributor is insolvent or shall make or agree to make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law; (ii) Distributor has given an assignment for the benefit of Distributor's creditors; (iii) involuntary or voluntary proceedings in bankruptcy are instituted against or by Distributor that are not

8




dismissed within 90 days; or (iv) Distributor is adjudicated a bankrupt; a receiver or trustee is appointed for Distributor or for any interest in its business, unless vacated within 90 days.

(e) No Cure Period – False Statement. The Company may terminate this Agreement upon written notice if a court of competent jurisdiction determines that the Distributor has made a material misrepresentation or false statement or materially misled the Company in order to procure a benefit or right from the Company.

4.5 Termination for Under-Performance.

(a) The parties have agreed on the Minimum Sales Requirements for each year in the Initial Term, as set forth in Schedule 4. The parties may in their discretion, but are under no obligation to, revise the Minimum Sales Requirements during the Term to reflect market conditions. The parties will confer at least annually with regard to updating the Minimum Sales Requirement. Any such revision must be in a writing signed by both parties.

(b) Except of the first anniversary of the Effective Date (one year after signing of this Agreement), if actual sales for a 12 month period ending on an anniversary of the Effective Date for any country within the Territory are less than 80% of the Minimum Sales Requirement for that country for that year, and the total actual sales for all Territories are less than 80% of the total Minimum Sales for all Territories, then the Company may remove that country from the Territory upon 60 days prior written notice to Distributor; provided that such notice is given within 90 days after the end of the relevant 12 month period. If a country is removed from the Territory, the required Minimum Royalty payment as provided in Schedule 6 shall be decreased proportionately.

(c) Additionally, except for the first anniversary of the Effective Date, if actual total sales for any three month period for all Territories is less than 50% of the Minimum Sales Requirement for such year (i.e., 1/4 of the Minimum Sales Requirement for that contract year), then the Company may terminate this Agreement upon sixty (60) days prior written notice to Distributor; provided that such notice is given within ninety (90) days after the end of the relevant three month period.

4.6 Termination by Playboy. Playboy may terminate the Playboy License prior to the expiration of this Agreement due to a breach of the Playboy License by Play Beverages or if Playboy declines to renew the Playboy License. If such termination occurs, it may also require termination of this Agreement, subject to a possible 120 day sell-off period after termination (which Playboy may refuse if the Playboy License was terminated for a breach). Termination of the Playboy License may occur due to non-payment by Play Beverages, upon not less than 10 days' prior written notice; other breaches require 30 days notice, except that Playboy may terminate immediately for an incurable breach. In the event the Playboy License is terminated, this Agreement shall immediately terminate upon such termination, subject to Section 4.8(b) below. Notwithstanding the foregoing, the Company and Distributor may mutually agree in writing to continue this Agreement using other Trademarks for the Products in lieu of the Playboy Trademarks.

4.7 Remedies. If the Distributor defaults, the Company may at its option exercise any one or more of the following remedies: (i) terminate this Agreement, effective immediately, provided that the notice required by Section 4.4 has been given; (ii) declare all indebtedness of the Distributor to it immediately due and payable; and/or (iii) exercise any and all other legal remedies available to it. Violation of this Agreement by Distributor may result in prosecution for

9




trademark infringement, unfair competition and other causes of action and the imposition of fines and/or criminal penalties.

4.8 <u>Distributor's Obligations Upon Termination.</u> Upon termination of this Agreement, the Distributor will immediately

(a) return to the Company (at the Company's expense) or upon the Company's request destroy, all advertising, promotional and sales materials in the Distributor's possession that were furnished by the Company, without charge (including without limitation brochures, catalogs, price books, photographs, designs, drawings, and engineering and other data);

(b) provide to the Company and Playboy within 10 days of the date of Termination a statement setting forth the number of Products on hand and a listing of all of Distributor's accounts for the Products. The Company shall have the option, exercisable within 10 days after receipt of the written inventory received from Distributor, to purchase all or any portion of the Products for a purchase price equal to Distributor's cost. Distributor shall deliver to the Company the Products purchased, within 5 days after receipt of notice exercising its option to purchase, and the Company shall pay the purchase price within 30 days after receipt of all items purchased. The Company shall bear all costs for shipping and insurance, and the risk of loss shall transfer to the Company when the Products are delivered to Distributor's dock. For a period of 120 days after the expiration of the Company's option to purchase inventory under this subsection (b) (the "Sell-Off Period"), Distributor may complete work in process, market, distribute and sell finished Products and use all Products marketing materials remaining in inventory, on a non-exclusive basis and in accordance with all of applicable terms of this Agreement (unless the Playboy License has been terminated and Playboy refuses to allow the Sell-Off Period). Any Products and marketing materials not sold and remaining after the Sell-Off Period shall be delivered to the Company, disposed of, or destroyed in accordance with the Company's written instructions. If Playboy refuses to allow the Sell-Off Period, and if Playboy's termination was not due to a breach by Distributor, the Company and Distributor agree to share in the cost of the remaining Products. The number of remaining Products must be commercial reasonable and must be similar to the Distributor's historical inventory amounts.

(c) immediately cease all use of the Trademarks, except as permitted for use of Products marketing materials during the Sell-Off Period; and

(d) at its earliest opportunity cease using the Business Name and remove it and other Trademarks from the Distributor's buildings, signage, vehicles and any of the Distributor's products, letterhead, and business cards.

4.9 <u>Survival.</u> The provisions of Sections 1, 3, 4.6, 4.7, 5.18, 7, 8, 10, 11 and 12 shall survive termination or expiration of this Agreement for any reason.

5. DISTRIBUTOR'S OBLIGATIONS. Distributor will do the following:

5.1 <u>Territory Development.</u> Distributor will use its best efforts to manufacture, promote and distribute the Products throughout the Territory during the Term. Specifically, within the first year after the Effective Date, Distributor shall have commercially launched the Products fully in all or substantially all channels in each country in the Territory as provided in the Marketing Program described in Section 5.9. For purposes of this Agreement, if an approved sub-distributor has been appointed for the country, a full commercial launch means that the

2030129_1



Products are being distributed to at least 50% of the accounts of the sub-distributor. If Distributor has not appointed an approved sub-distributor for the country, a full commercial launch means that the Products are being distributed to at least as many outlets as would equal 50% of the accounts serviced by the largest beverage distributor or competitor in that country; provided that at the request of Distributor, made not more than 4 months after the Effective Date, the Company will consider in good faith alternative definitions for commercial launch in specified countries. It is understood that in some situations, legal requirements or the E.U. or the individual countries may impose requirements that delay the launch period in that country, and consideration will be given to such situations as set forth in Section 4.4(b).

5.2     Sales and Promotional Goals.   Distributor will meet the Minimum Sales Requirements and other promotional and distribution goals set forth in Schedule 4.

5.3     Compliance with Playboy License. Distributor shall conduct all of its activities hereunder in full compliance with all requirements of the Playboy License that are communicated to it by Playboy or the Company. Specifically, Distributor agrees to comply with the Distributor Requirements contained in Schedule 5, as well as this Agreement. Distributor shall fully and promptly comply with any reasonable requests of the Company for information or reports which the Company may need in order to comply with the reporting requirements of the Playboy License.

5.4     Sub-Distributors. Distributor may appoint qualified sub-distributors with exclusive or non-exclusive rights within specified countries or areas within the Territory. The appointment of each sub-distributor is subject to the prior written approval of both the Company and Playboy, which approval may be reasonably withheld. Distributor may establish affiliate companies for various countries within the Territory. Approval by the Company and or Playboy is not necessary if the appointment and/or transfer of part of the rights under this Agreement to a legal entity wholly owned or majority controlled by the Distributor. All sub-distributors must agree in writing to comply with this Agreement, Schedule 5, the terms of the Playboy License disclosed to them, and such other restrictions as may be reasonably imposed by the Company or Playboy. Distributor shall ensure that its sub-distributors comply with all applicable terms and conditions of this Agreement, including adhering to Territory restrictions, and will be fully responsible to the Company and Playboy for any violation of this Agreement or the Playboy License by its sub-distributors. Distributor may obtain non-refundable initial fees or payments from sub-distributors only with the express written consent of the Company, which consent may be withheld in the Company's reasonable discretion.

5.5     Localization of Product Materials.  Distributor will be responsible for translating Product labels, advertising and marketing materials, and any other Product-related documentation to local language(s), or as otherwise agreed to with the manufacturer. All translations will be subject to prior written approval by the Company. The Company, subject to Playboy's approval (which may require an extension of the 15-day approval period), shall have 15 days to approve any such translations.  If so requested in writing, Distributor shall make any reasonable changes to such materials.

5.6     Compliance With Laws.  Distributor shall be responsible for and shall obtain and/or comply with all governmental laws, regulations, necessary for the manufacture, export, import and distribution of the Products in each country in the Territory, as applicable. Distributor will be responsible for producing, bottling, packaging and labeling the Products as required by the laws of the country of origin and the laws of the Territory. Distributor will ensure that all label information required by law in each country of the Territory is included on the




Products labels. Within member states of the European Community (the "EU"), rights or obligations created or imposed by this Agreement may not be exercised or enforced in a manner contrary to Community Law. Distributor may not solicit orders from outside the Territory nor engage in any commercial or promotional activities with respect to the Products outside the Territory, the right of any purchaser of the Products within the Territory to export the Products purchased to other member states of the EU staying unaffected. Limitation of the exercise of rights or the enforcement of obligations due to Community Law or the provisions of the foregoing subsections shall not affect the validity or enforceability of any other rights and obligations under this Agreement.

5.7     Distribution. Distributor will not distribute, cause to be distributed or assist in the distribution of the Products outside the Territory, other than as may be expressly permitted in writing by the Company, nor will Distributor distribute, cause to be distributed or assist in the distribution of any products or item not specifically approved by the Company that bears any Trademark during or at any time after the Term of this Agreement. Distributor will not engage in, or permit its sub-distributors or customers to engage in, transshipping or other violation of the scope of the Territory.

5.8     Review of Reports. Distributor will keep and maintain accurate and detailed books and records of its activities under this Agreement. Upon reasonable request, Distributor will allow the Company and Playboy to review Distributor's books and records, including any depletion or other reports applicable to the Products, and shall have the right to make extracts therefrom or copies in order to ensure Distributor's compliance with this Agreement. Within 10 days of a request from the Company or Playboy, Distributor will supply an electronic, facsimile, or other statement detailing Distributor's accounts for the Products.

5.9     Marketing. Distributor will develop a marketing program with the assistance of the Company and Play Beverages ("the Marketing Program") for the Territory within 90 days of the Effective Date and submit such program to the Company for its review and approval, which approval shall not be unreasonably withheld (provided, however, that Playboy's approval is also required and is discretionary) and provided that the Marketing Program can be developed on a country-by-country basis. Approval of the Marketing Program must be given prior to distributing Products for sale in any Country within the Territory. Distributor will update its marketing programs, at least annually, and will execute them in good faith. Distributor will have sufficient sales and marketing staff to develop a market for the Products and to handle inquiries from potential customers in the Territory regarding the Products and be able to respond within a reasonable time to inquiries and sales leads.

5.10    Handling Business. Distributor will maintain a business organization and equipment necessary to function efficiently and effectively in the sale and distribution of Products. Distributor will maintain all state, federal and local licenses, approvals and permits necessary for it to perform under this Agreement and will keep such licenses, approvals and permits current.

5.11    Quality and Production. Distributor will assure that all Products are of merchantable quality and that only Products of merchantable quality are sold. Distributor will notify the Company of any labeling requirements of which it is aware specifically required in the Territory. Unmerchantable products are defined to be Products that are spoiled, putrid or foul, do not conform to the Company's manufacturing specifications or quality standards for such Products, or have sustained damage to its primary or secondary packaging and are no longer commercially marketable. If not due to negligence on the part of the Company, Distributor shall

12



destroy, at its own expense, or as otherwise agreed to with a manufacturer, all unmerchantable Products.

5.12    Report Law Suits or Claims. Distributor will notify the Company promptly after becoming aware of any actual or potential claim or suit against the Company, the Distributor, or any customer of Products that alleges that a patent, trade name, copyright, or trademark of a third person will be infringed by reason of the sale or use in the Territory of the Products or any promotional materials of the Company or Distributor with respect to the Products.

5.13    Infringement. Distributor will notify the Company promptly after becoming aware of any infringement within the Territory in connection with the Products of any of the Trademarks, and will assist the Company or Playboy (at the Company's or Playboy's expense, as applicable) in undertaking or assisting with any action or proceedings that the Company or its licensors may direct. Distributor will not make, cause others to make, or assist others in making, any claim whatsoever to any or all of the Trademarks or any trademark, designation, name, phrase, design or symbol similar thereto, in connection with the manufacture, advertising, promotion, sale or distribution of any merchandise.

5.14    Manufacturing, Storage and Handling Standards. Distributor will comply with regulatory standards for manufacturing, storage, transportation and handling of Products and will provide access to its warehouse for the Company to inspect inventory.

5.15    Use of Trade Name or Trademarks. Distributor will ensure that the appropriate Trademarks (as approved by the Company) appear on the Products' labels, and will refrain from removing the Trademarks from Products and from using the Trademarks on any other products except the Products. Except as expressly set forth in Section 2.3, Distributor will refrain from using any Trademarks in the Distributor's corporate or business names without the Company's prior approval, or in any case, in any manner inconsistent with the rights of the Company and its licensors in the Trademarks.

5.16    Distribution in Territory. To the extent Distributor distributes Products in member states of the European Union ("EU"), rights or obligations created or imposed by this Agreement may not be exercised or enforced in a manner contrary to EU law. Distributor will not solicit orders from outside the Territory nor engage in any commercial or promotional activities with respect to the Products outside the Territory. The parties acknowledge that applicable EU law may limit the right of the Company and Distributor to restrict the right of any purchaser of the Products within the Territory to export the Products purchased to other member states of the EU. The parties agree to use their best efforts to limit resale of the Products by purchasers within the Territory to purchasers outside the Territory to the full extent permitted by applicable law. Limitation of the exercise of rights or the enforcement of obligations due to EU law or the provisions of this Agreement shall not affect the validity or enforceability of any other rights and obligations under this Agreement.

5.17    E-Commerce Web Site. Any advertisement, promotion, sale or distribution of the Products via an "E-Commerce Web Site" shall be subject to the terms and conditions of the E-Commerce Guidelines set forth on Schedule 5 hereto. In the event Distributor fails to adhere to any of the terms and conditions of the E-Commerce Guidelines, such failure shall be deemed a default under this Agreement and grounds for immediate termination of this Agreement upon written notice from the Company.



5.18    Non-Circumvention. Except with the Company's prior written consent, during the term of this Agreement and for a period ending two years after termination or expiration of this Agreement, Distributor or its sub-distributors shall not manufacture, market or distribute any non-alcoholic beverages identified by the Trademarks (or marks confusingly similar to the Trademarks) other than the Products manufactured under this Agreement. By way of clarification, this restriction shall apply even if the Distributor or the seller of such beverages is licensed to use the Trademarks by Playboy or its licensees other than the Company. Distributor shall cause any sub-distributors to agree to this restriction.

5.19    Exclusivity. During the Term, the Distributor agrees not to manufacture, market or distribute any non-alcoholic energy or sport drink beverages competing with the Products, or assist any third party in doing so.

5.20    Services. Except as expressly provided in this Agreement, Distributor agrees to pay the Company for any training, support assistance, marketing assistance and other services provided by the Company to Distributor under this Agreement at reasonable rates agreed upon by such parties in writing. This Section 5.20 shall not be applied to the proceedings described in Section 2.9.

6.    COMPANY'S OBLIGATIONS.

6.1    Promotional Materials. Company will provide camera ready copy and images for advertising and promotional materials. It will be Distributor's obligation to translate or otherwise localize the materials, to comply with local laws and regulations and to reproduce and distribute the materials. All promotional materials, whether localization of Company materials or created by Distributor, must be approved by the Company prior to use.

6.2    Additional Assistance. From time to time, Distributor may request the services of the Company for any training, support assistance, marketing assistance and other services. The Company shall give reasonable consideration to such requests, and the parties will reasonably cooperate to agree upon the assistance to be provided by the Company, at the rates agreed upon pursuant to Section 5.20. (See schedule 4).

6.3    Approval Process. Should the Distributor need the approval of the Company and/or Playboy according to this Agreement, Company shall respond to the Distributor within 15 U.S. Business Days and/or to work with the Distributor to obtain Playboy's approval, where required, within 15 U.S. Business Days as well. The Company shall not unreasonably withhold approval of requests made to it.

7.    ROYALTIES.

7.1    Royalties. In consideration for the rights and licenses granted by the Company, Distributor will pay to the Company the Minimum Royalties and, if higher, the Earned Royalty, as set forth in Schedule 6 (collectively, the "Royalties").

7.2    Sales Report and Payment Terms. Within 10 days after the end of each calendar month, Distributor will submit to the Company a written report in a form reasonably agreed upon by the parties, setting forth in detail the number of units of each type of Products distributed by Distributor during such month, the countries and sales channels in which such Products were sold, and the calculation of Earned Royalties, and, if applicable, the amount of Earned Royalties offset against the Minimum Royalty and the remaining amount of the Minimum Royalty that has

14



not been so offset. After the full amount of the Minimum Royalty has been offset, the amount of Earned Royalties that are due and payable shall be paid to the Company together with the report via wire transfer.

7.3    Interest. Any Royalties not paid when due will accrue interest at the rate of 1.5% per month (18% APR) or the highest rate allowed by law, whichever is less.

7.4    Taxes. Distributor shall be responsible for all sales, use, excise, value-added, and other taxes, tariffs, and customs or import duties arising out of this Agreement (other than taxes on the Company's net income imposed by the U.S.). Distributor may withhold income taxes payable by Company as required by any government agency/entity.

7.5    Audit Rights. Distributor shall maintain, for 5 years from the calendar year in question, complete books and records regarding units of the Products manufactured and distributed by Distributor and Royalties paid to the Company hereunder. The Company's representative or designated auditor may, at the Company's expense, audit the books and records upon notice to Distributor at any time. If an audit shows that Royalties were underpaid, Distributor shall promptly pay the amount due plus interest as set forth above. If the underpayment was 5% or more of the total for the period under audit, Distributor shall pay the cost of the audit, including reasonable travel and lodging expenses incurred. If three or more audits during the Term show an underpayment of 5% or more for the period audited, the Company may terminate this Agreement immediately upon written notice.

7.6    Currency. All payments to the Company shall be in United States Dollars.

8.    REPRESENTATIONS AND WARRANTIES.

8.1    Company Representations and Warranties. The Company represents and warrants that:

(a)    it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and that it has the requisite power and authority to execute and deliver this Agreement and to perform all of its obligations hereunder;

(b)    the execution, delivery and performance by the Company of this Agreement have been duly authorized and approved by all necessary action by the Company, and assuming due authorization, execution and delivery by the Company, this Agreement constitutes the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms;

(c)    the execution and delivery of this Agreement and the performance of the Company's obligations hereunder do not conflict with, violate, breach, constitute a default under, or require any consent under any contract between the Company and any third party;

(d)    it has the right to grant all licenses granted to Distributor under this Agreement;

(e)    it has the title, trade secrets protection, and/or patent rights to the formulae used in the Products; its title and rights do not infringe on any third party's rights to use the formulae; and that conceptually, the formulae are merchantable;



15

(f)   it will not license any other person or entity the rights to distribute the Products within the Territory during the Term of this Agreement.

(g)   it does and, during the Term, shall comply with all published laws, regulations, rules and orders applicable to the performance of its obligations under this Agreement.

8.2   <u>Distributor Representations and Warranties</u>. Distributor represents and warrants that:

(a)   it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and that it has the requisite power and authority to execute and deliver this Agreement and to perform all of its obligations hereunder;

(b)   the execution, delivery and performance by Distributor of this Agreement have been duly authorized and approved by all necessary action by Distributor, and assuming due authorization, execution and delivery by Distributor, this Agreement constitutes the legal, valid and binding obligations of Distributor, enforceable against Distributor in accordance with its terms;

(c)   the execution and delivery of this Agreement and the performance of Distributor's obligations hereunder do not conflict with, violate, breach, constitute a default under, or require any consent under any contract between Distributor and any third party;

(d)   it will not make any representations, warranties, or claims about the Products, except those specifically approved in writing by the Company. Distributor will be solely liable for any unauthorized representations or warranties made by it or its sub-distributors or employees;

(e)   it does and, during the Term, shall comply with all published laws, regulations, rules and orders applicable to its performance of its rights and obligations under this Agreement;

(f)   the Products distributed by Distributor shall conform to the quality standards set forth in this Agreement and shall be merchantable and fit for their intended purpose.

8.3   <u>Disclaimer</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PARTIES HEREBY SPECIFICALLY DISCLAIM ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.

9.   INSURANCE.

9.1   <u>Product Liability Insurance</u>. Distributor will maintain primary and excess products liability coverage totaling at least US$2,000,000 per occurrence, on an occurrence (not claims-made) basis, and containing a Vendor's Liability Endorsement applicable to the Company and all customers requesting such coverage through the Distributor. Such policy will name the Company as an additional insured.



9.2    General Liability Insurance.  Each party shall maintain comprehensive general liability insurance in effect to protect the Company and Distributor, beginning on the date on which Distributor begins to market Products to customers.  Distributor's insurance shall be primary coverage and shall name the Company as an additional insured.  The Company's insurance shall be primary coverage and shall each name Distributor as an additional insured. Each policy shall provide a minimum coverage of US$2,000,000.  Distributor and the Company shall provide the other with a certificate of insurance evidencing its compliance with the terms of this Section 9.2 within thirty (30) days of the date Distributor begins to market Products in the Territory.  That certificate shall specify that such policies will not be cancelled or terminated without at least 30 days advance written notice to such additional insured.

10.    INDEMNIFICATION.

10.1    Indemnification by Distributor.  Distributor will indemnify, defend, and hold harmless the Company and Playboy, and the distributors and dealers and the officers and employees of each of the foregoing, from and against any and all claims, losses, expenses, damages, claims, suits, demands, and causes of action (including without limitation the reasonable fees and expenses of attorneys, court costs, and other litigation and dispute resolution costs) to the extent arising from a third-party claim with respect to (i) any personal injuries to or death of persons, or any damage to property, occurring as a result of or in any way arising out of manufacture, sales, production, defects, or storage of the Products (including their bottling or packaging) by Distributor, unless such claim is based upon the formula for the Products or concentrate obtained from the Company's suppliers; (ii) any alleged defects in materials or workmanship in the Products; (iii) any breach by Distributor or its sub-distributors of this Agreement; (iv) Distributor's distribution of the Products covered by this Agreement; (v) any actual or claimed infringement of any patent, trademark, copyright, or other intellectual property or proprietary rights by reason of any modifications to the Products or to the advertising or promotional materials by Distributor, or arising out of any advertising or promotional created by Distributor; or (vi) any claims arising from previous Agreements signed previously for the Territory with third parties.

10.2    Indemnification by the Company.  The Company and Play Beverages will indemnify, defend, and hold harmless the Distributor, its officers and employees from and against any and all losses, expenses, damages, claims, suits, demands, and causes of action (including without limitation reasonable fees and expenses of attorneys, court costs, and other litigation and dispute resolution costs) to the extent arising from a third-party claim with respect to (i) any alleged infringement of any patent, trademark, copyright, or other intellectual property or proprietary rights by reason of the Products or any advertising or promotional materials created or supplied by the Company, except to the extent arising out of any modifications made by Distributor, its sub-distributors, or any third party; or (ii) any breach by the Company of this Agreement.  If any such items are finally held or believed by the Company to infringe or their distribution is enjoined, the Company shall, at its option, (a) obtain a license or grant of rights under the rights that have been infringed, (b) modify the infringing item so it is noninfringing or provide to Distributor a substitute Product or item that is noninfringing, or (c) if the foregoing options are not commercially reasonable, terminate Distributor's license to use the infringing item and, if the infringing item was a Product or a Playboy Trademark, this Agreement, upon written notice to Distributor.  The Company shall have no liability for infringement based on modification of the Products or advertising or promotional materials by anyone other than the Company.  In no event will such indemnification include incidental or consequential damages, unless part of judgment or approved settlement, including without limitation compensation for




lost profits or anticipated sales. To the extent the claim arises out of a claimed infringement by the Playboy Trademarks, the Company's obligations under this Section 10.2 may be fulfilled by Playboy at the Company's and Playboy's option.

10.3    Indemnification Procedure. A party seeking indemnification (the "Indemnified Party") shall notify the other party (the "Indemnifying Party") as soon as reasonably possible if it becomes aware of any claim for which it may be entitled to indemnification under this Section 10, and the Indemnified Party hereby gives the Indemnifying Party full and complete authority and control over the defense of the claim, and shall provide such information and assistance as is necessary to enable the Indemnifying Party to defend, compromise or settle such claim. The Indemnifying Party will pay any and all resulting costs, and attorney's fees associated with complying with this section. The Indemnified Party may, at its option and expense, participate in the defense of the claim with separate legal counsel.

11.    CONFIDENTIAL INFORMATION. During and after the term of this Agreement, each party, as the Recipient of the other party's Confidential Information, agrees not to disclose to any person or use for any purpose, except as expressly permitted by this Agreement, any Confidential Information of Discloser. Recipient may disclose Confidential Information only to its employees who need to know such information, and who are bound to keep such information confidential. Recipient shall give Discloser's Confidential Information at least the same level of protection as it gives its own Confidential Information of similar nature, but not less than a reasonable level of protection. Recipient shall maintain Confidential Information in a safe and secure place and shall not copy Confidential Information except to the extent necessary for the purposes of this Agreement. Specifically, Distributor will maintain the confidentiality of all documents, confidential information, trade secrets, marketing and operating methods, and data of the Company relating to the Products and the business of Company ("Trade Secrets") and refrain from using and disclosing Trade Secrets for personal gain, or for any other purpose not in furtherance of or incidental to the obligations of Distributor hereunder, except with the Company's written consent. Distributor shall not disclose the terms of this Agreement, other than disclosure to its accountants, attorneys or other agents or representatives with a need to know. Notwithstanding the above, a party may disclose the terms of this Agreement and its terms to the extent required by law.

12.    MISCELLANEOUS.

12.1    Third Party Beneficiary. Playboy and Play Beverages, LLC are each an intended third-party beneficiary of this Agreement.

12.2    Force Majeure. Fires, floods, wars, acts of war, strikes, lockouts, labor disputes, political turmoil or unrest, accidents to machinery, delays or defaults of common carriers, orders, decrees or judgments of any court, or any other contingency beyond the control of the Company or the Distributor, whether related or unrelated, or similar or dissimilar to any of the foregoing, will be sufficient excuse for any resulting delay or failure in the performance by either party hereto of its respective obligations under the Agreement, but such performance will be excused only as long as the force majeure continues.

12.3    No Assignments. Neither party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other, in its sole discretion, and any attempt to do so will be void and will be a material breach of this Agreement.



18

12.4 Relationship of Parties. The relationship between the parties is that of independent contracting parties, and not that of partners, joint ventures, or principal and agent. Neither party has or will hold itself out as having the authority to bind or act in the name of or on behalf of the other.

12.5 Notices. All notices and all written communication and reports and any other writings required or contemplated by this Agreement will be in the English language. Notices hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered personally, sent by commercial expedited delivery service or, to the extent receipt is confirmed, faxed or emailed to the appropriate address or number set forth below.

**If to Distributor:**

Noble Gate Industrial (Shenzhen) Co., Ltd.
3206 Building #2 Zhongshan Garden,
Huli Rd., Shenzhen,
China
Attn: Mr. Sameer Alshun
Telephone: +8675582140780
Fax: +8675582140782

**If to the Company:**

Iehab Hawatmeh
c/o CirTran Beverage Corp.
4125 South 6000 West
West Valley City, Utah 84128
Telephone: +(801) 963-5112
Fax: +(801) 963-5180

**Copy to Attorney:** (which shall not constitute notice):

**Copy to Cirtran's Attorney** (which shall not constitute notice):


Steven H. Bergman
**RICHARDS BRANDT MILLER NELSON**

Wells Fargo Center, 15th Floor
299 South Main Street
Salt Lake City, Utah 84111
Telephone: (801) 531-2000
Facsimile: (801) 532-5506
Steven-Bergman@rbmn.com

**If to Playboy:**

Playboy Enterprises International, Inc.
680 Lake Shore Drive
Chicago, IL 60611
Attn: Sarah Haney
Telephone: +(312) 751-8000
Facsimile: +(312) 988-9857

**If to Play Beverages:**

Fadi Nora
4125 South 6000 West
West Valley City, Utah 84128
Telephone: +(801) 963-5112
Fax: +(801) 963-5180

12.6 Binding on Successors. This Agreement will bind and inure to the benefit of the parties and their respective legal representatives, successors, and permitted assigns, but nothing in this Agreement will confer any rights or remedies on any person or entity other than the foregoing.

12.7 Enforcement. Failure of either party to enforce at any time any right or remedy it may have under this Agreement will be not be a waiver of such provisions or rights, and will not



preclude or prejudice such party from thereafter exercising the same or any other right or remedy it may have under this Agreement.

12.8  Governing Law.  This Agreement will be governed by and interpreted and construed in accordance with the internal laws of the State of Utah, U.S.A. without reference to principles of conflicts or choice of law. All disputes and matters arising under, out of, in connection with or relating to this Agreement shall be brought only in a court of competent jurisdiction in the State of Utah and the parties submit to the exclusive personal jurisdiction and venue of such courts. All legal proceedings shall be conducted in the English language

12.9  Severability.  If any provision of this Agreement is deemed invalid or unenforceable, that provision shall be modified, if possible, to the minimum extent necessary to make it valid and enforceable, or if it cannot be so modified, then severed, and the remainder of this Agreement shall remain in full force and effect.

12.10  Amendment.  No change, modification, or alteration to this Agreement, or to the distribution relationship evidenced hereby will be effective unless set forth in writing and approved by Playboy and signed by the parties.

12.11  Recall.  If either party is required (or voluntarily decides) to initiate a recall of any Products, whether or not such recall has been requested or ordered by any governmental authority or agency having jurisdiction over either party, the parties shall cooperate in good faith to manage the recall and to allocate the costs of the recall.

12.12  Publicity.  Neither party will make any press release or other public disclosure regarding this Agreement or the transactions contemplated hereby without the other party's express prior written consent, except as required under applicable law or regulation, including SEC regulation, or by any governmental agency, in which case the party required to make the press release or public disclosure shall use commercially reasonable efforts to obtain the approval of the other party as to the form, nature and extent of the press release or public disclosure prior to issuing the press release or making the public disclosure.

12.13  Entire Agreement.  This Agreement, including the Schedules, which are attached hereto and incorporated herein by reference, supersedes all previous and contemporaneous agreements and understandings between the parties and is intended as the complete and exclusive statement of the terms of their understanding and agreement with respect to the subject matter hereof. There are no representations, oral or written, upon which the Company or the Distributor has relied as an inducement to enter into this Agreement, other than those set forth herein. This Agreement shall supersede any conflicting or contrary terms and conditions of any purchase order or other order form whether supplied by Company or Distributor.

12.14  Construction.  The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against either party.





20

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**COMPANY:**

CIRTRAN BEVERAGE CORP.

By: _____
   Name: Iehab J. Hawatmeh
   Title: Chairman

Date: _Jun 1, 2012_

PLAY BEVERAGES, LLC

By: _____
Name: Fadi Nora
Title: Manager

Date: _6 - 1 - 12_

**DISTRIBUTOR:**

Noble Gate Industrial (Shenzhen) Co., Ltd.

By: _____
   Name: Sameer Alshun
   Title: Chairman

Date: _JUN / 1 / 2012_

# SCHEDULE 1 - PRODUCTS

The following products are authorized for manufacturing, sale and distribution by Distributor:

Playboy® Energy Drink – 250ml aluminum cans
Playboy® Energy Drink Light - 250ml aluminum cans

Playboy® Energy Drink – 500ml aluminum cans
Playboy® Energy Drink Light - 500ml aluminum cans

Playboy® Energy Shot – 60ml plastic bottles
Playboy® Energy Shot Light - 60ml plastic bottles

If the Company elects to distribute additional products in the PlayBev line of products in the Territory, Distributor shall have a first right of refusal to all such products under the same terms and conditions of this Agreement and will be given 30 days to accept or reject such new products, from the date it receives written notice from the Company of such future products or line extensions. If Distributor does not accept in writing any such new products within the 30 day notice period, the Company has the right to distribute or license those products to other distributors in the Territory. If the Products are modified, changed, or improved, Distributor may distribute the new version of the Products or continue to distribute the Products with the prior formulation in Distributor's reasonable discretion.

The Company reserves the right to reformulate any of the Products or flavors or discontinue them, so long as all flavors are not discontinued and so long as the Products include a "regular" and "light" version of the drinks.

Should the Company intend to reformulate or discontinue the Products which have been approved by the Company according to Section 2.9 (the "Originally Approved Products"), the parties shall agree on a new formula before the Originally Approved Products are reformulated or discontinued by the Company.




## SCHEDULE 2 - TERRITORY

Territory: The Distributor has the exclusive right to sell and distribute the Products in all cities and towns in Main Land China, Hong Kong and Macau subject to any government restrictions in the territory and final clearance from Playboy.

Distributor's exclusivity does not extend to United States military bases located within the Territory.

Distributor shall have no right to export Products from the Territory or to sell the Products for export.

2030129_1




achment 1 to Schedule 2

| try ( Min Cases = 24 cans Required) | Macau | HK | China | TOTAL cases | CirTran/ Playboy Royalty per Case (USD) | CirTran/ Playboy Royalty Min License (000 USD) | Upfront Deposit/ Royalty Min for License (000 USD) |
|---|---|---|---|---|---|---|---|
| oy Energy 2012 full year 000 cases * | 5 | 15 | 180 | 200 | $ 3.00 | $ 600 | $ 500 |
| oy Energy 2013 full year 000 cases | 10 | 20 | 320 | 350 | $ 3.00 | $ 1,050 | $ 600 |
| oy Energy 2014 full year 000 cases | 10 | 20 | 470 | 500 | $ 3.00 | $ 1,500 | $ 700 |
| oy Energy 2015 full year 000 cases | 15 | 25 | 520 | 560 | $ 3.00 | $ 1,680 | $ 800 |
| oy Energy 2016 full year 000 cases | 15 | 30 | 655 | 700 | $ 3.00 | $ 2,100 | $ 900 |
| oy Energy 2017 full year 000 cases | 15 | 35 | 721 | 770 | $ 3.00 | $ 2,310 | $ 900 |
| oy Energy 2018 full year 000 cases | 15 | 40 | 793 | 847 | $ 3.00 | $ 2,542 | $ 900 |
| oy Energy 2019 full year 000 cases | 15 | 46 | 872 | 932 | $ 3.00 | $ 2,797 | $ 900 |
| oy Energy 2020 full year 000 cases | 15 | 52 | 959 | 1,026 | $ 3.00 | $ 3,079 | $ 900 |
| oy Energy 2021 full year 000 cases | 15 | 60 | 1,055 | 1,130 | $ 3.00 | $ 3,391 | $ 900 |
| AL (000 Cases) | 130 | 343 | 6,544 | 7,016 | | $ 21,049 | $ 8,000 |

is no Minimum Volume Requirement for First Contract Year



24



2030129_1

The Distributor may use the following Trademarks in accordance with Section 2.2:

Playboy Trademarks:

# PLAYBOY



Rabbit Head Design

Company Trademarks/Trade Names:

**PlayBev** (the "Business Name")

OR

**Play Beverages**



25



Sales Goals and Minimum Sales Requirements:

Distributor is required to have Net Sales of at least the minimum number of cases of the Products set forth in Attachment 1 to Schedule 2 (the "Minimum Sales Requirements"), for years two through ten of the Term. Distributor must launch Product in every country in the Territory during the first contract year.

Advertising and Promotion:

Distributor, at its own cost and expense, will advertise and promote the Products in the Territory. The Company will provide camera-ready copy and images for advertising and promotional materials, as may be developed by the Company from time to time during the Term. Distributor is responsible for translating or otherwise localizing all camera-ready copy, images and other advertising and promotional materials provided by the Company, for use in the Territory. All advertising and promotional materials, including point of sale items, give-away items and translated or modified versions of materials provided by the Company, must be approved by the Company prior to use. Distributor will refrain from any promotional activities that may negatively affect the value of the Playboy Trademarks or the Company IP.

Distributor shall spend not less than 10% of its Net Sales proceeds on advertising and promotion of the Products in the Territory during the first two years of the Term, and 5% of Net Sales per year thereafter for the remainder of the Term. Distributor has committed not less than a total amount of USD$500,000 for the initial launch of Products in the Territory.

The Company will reasonably consider requests by Distributor to assist in organizing and paying for parties and events promoting the Products and to arrange for Playmates and others to attend such events. The Company retains sole discretion as to whether to share in any costs of such events or other marketing efforts.

The Company will also assist Distributor by introducing Distributor's principals to the publishers of local Playboy magazines in the Territory and by requesting special pricing for advertising in such magazines.

The Company will allow Distributor to participate in and share the benefits of any advertising and marketing programs made available to international distributors of Playboy-branded products, on the same terms made available to other distributors of the Company (taking into account sales volumes and other relevant factors).

Where the Distributor need the approval of the Company for its marketing program(s) and/or marketing and promotional materials for the Products, the Company shall consider and take into account as a factor in its approval process, the cultural differences and the regional specific customs, provided that these differences (i) do not violate the interests of the Company and/or Playboy, (ii) are not in contradiction with the regulations of Schedule 3 and Schedule 5. However, the Company retains reasonable discretion as to whether to grant or withhold approval.



26



| | |
|---|---|
| Attachment 1: | E-Commerce Guidelines |
| Attachment 1.A: | Standards and Practices |
| Attachment 1.B: | Example Privacy Policy |
| Attachment 1.C: | Unacceptable Advertisement Categories On E-Commerce Web Sites |





## E-COMMERCE GUIDELINES

1. Distributor's E-commerce Web Site: Distributor may advertise and offer the availability of the Products on its own E-commerce Web Site and may accept orders for the Products placed through its own E-commerce Web Site subject to the following provisions:

   a. Distributor's E-commerce Web Site must, in conjunction with a link to www.playboystore.com (or any other url as Playboy's Licensee may direct from time to time), inform visitors to such E-commerce Web Site that the Products and other fine Playboy-branded Products are available for sale through such link.

   b. Distributor may not advertise or promote the availability of the Products on its own E-commerce Web Site, or accept orders for the Products through its own E-commerce Web Site. If Playboy-branded products (including, but not limited to, the Products, other Playboy-branded items not in the Product category, video media and Spice branded products) constitute twenty percent (20%) or more of any such E-commerce Web Site's total product offerings. For purposes of clarification, such Playboy-branded products (i) may not be the only branded products advertised, promoted and sold on and through such E-commerce Web Site; and (ii) must not constitute twenty percent (20%) or more of all products advertised, promoted or sold on such E-commerce Web Site.

   c. Distributor may not use any of the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-commerce Web Site.

   d. Distributor will ensure that its E-commerce Web Site continuously displays a banner in the form and content acceptable to Playboy informing all visitors to such E-commerce Web Site that no orders for the Products will be accepted and no Products will be shipped outside the Territory.

   e. Distributor will ensure that its E-commerce Web Site continuously displays the trademark or copyright notices as directed by Playboy's Licensee in connection with the display, advertisement and offer of the Products.

   f. None of the Playboy Properties used in conjunction with the advertisement and offer of the Products on Distributor's E-commerce Web Site may be changed, manipulated or modified in appearance. Distributor may not use the Playboy Properties to advertise, promote or sell non-Playboy branded products or services.

   g. All aspects of the display of the Playboy Properties and Products on Distributor's E-commerce Web Site will be subject to the prior and ongoing approval of Playboy, including design, layout, content, advertising and links. Distributor must obtain Playboy's approval prior to any change in already approved design, layout, content advertising or links of Distributor's E-commerce Web Site.

   h. Notwithstanding anything hereof to the contrary, Playboy's Licensee shall have the right to immediately withdraw the permission set forth in this Attachment 1 and the Distributor Contract upon receipt of the written notice Playboy's Licensee if Playboy deems, in its sole discretion, that any aspect of Distributor's E-commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices,



28



which Playboy may amend from time to time, set forth on Attachment 1.A. attached hereto and made a part hereof. In the event of such withdrawal, Distributor must immediately remove all of the Playboy Properties and the Products from Distributor's E-commerce Web Site.

i. Distributor shall include its own Privacy Policy on Distributor's E-commerce Web Site consistent with the terms and conditions of Playboy.com, Inc.'s privacy policy which is attached hereto by way of example as Attachment 1.B.

j. None of the advertisements contained on Distributor's E-commerce Web Site shall include those categories set forth on Attachment 1.C. attached hereto and made a part hereof unless approved in advance in writing by Playboy.

2. E-tailers' and Retailers' E-commerce Web Sites: Distributor may sell and distribute the Products to E-tailers and retailers which may sell and distribute the Products via such E-tailers' or retailers' E-commerce Web Sites provided that:

a. Distributor will not sell or distribute the Products to any E-tailer or retailer who will advertise, promote and offer Playboy-branded products on an E-commerce Web Site if Playboy-branded products (including, but not limited to, the Products, other Playboy-branded items not in the Product category, video media and Spice branded products) constitute twenty percent (20%) or more of any such E-commerce Web Site's total product offerings. For purposes of clarification, such Playboy-branded products (i) may not be the only branded products advertised, promoted and sold on and through any such E-commerce Web Site; and (ii) must not constitute twenty percent (20%) or more of all products advertised, promoted or sold on and through any such E-commerce Web Site.

b. Distributor will use commercially reasonable efforts to ensure that such E-tailers and retailers follow the guidelines set forth in these E-commerce Guidelines for the advertisement, promotion and offer of the Products via any E-commerce Web Site: and

c. Unless authorized by Playboy in writing, Distributor will not sell or distribute the Products to an E-tailer or retailer: (i) who is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion, competitive with *PLAYBOY Magazine*; (ii) who will advertise, promote or offer the Products on an E-commerce Web Site that is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion competitive with *PLAYBOY Magazine*; or (iii) who will advertise, promote, or offer the Products for sale on an E-commerce Web Site in conjunction with any products or services identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion, competitive with *PLAYBOY Magazine*.

In the event Playboy or Playboy's Licensee discovers any E-commerce Web Site which is in violation of any of the guidelines set forth above, Distributor, upon the prior written notice of Playboy's Licensee, shall cease all sales and distribution of the Products to the retail or E-tailer owner or controller of any such E-commerce Web Site.



29



## STANDARDS AND PRACTICES

The following may not be depicted (in actual or simulated form) or explicitly described on any E-commerce Web Sites displaying the Playboy Properties or the Products:

1. Violence

   Violent behavior and links to sexuality or eroticism with violence, directly or indirectly.

2. Rape

   Rape (including so-called "implicit" or "consenting" rape) is strictly forbidden.

3. Incest

4. Sadism and Masochism

5. Bondage

6. Bestiality

7. Child Pornography

   No nude or seminude photos of anyone under 18 years old at the time such photos were taken. Even if a model visibly looks or is actually older than 18, no depictions of any model who is portrayed as younger than 18 in any sexual act. No explicit description of or explicit references to anyone under 18 years of age.

8. Extreme Sexual Explicitness

   No penetration, erections, ejaculations or close-up shots or descriptions of oral sex.

9. Graphic Close-ups of Genitals

   No close-ups or descriptions of genitals, particularly in the context of actual or simulated sexual activity.

10. Actual Sexually Explicit Conduct

    No sexual intercourse (including genital-genital, oral-genital, anal-genital or oral-anal).

11. Necrophilia

12. Defecation

13. Fisting

14. Bukkake

15. Any content or interactivity, the presentation of which would be obscene, illegal or actionable under applicable laws.





This Privacy Policy (the "Policy") applies to Playboy Enterprises, Inc.'s and Playboy.com, Inc.'s (collectively, "Playboy") family of websites (the "Sites"). These include playboy.com; cyber.playboy.com; storeplayboy.com; auctions.playboy.com; playboynet.playboy.com; racingusa.playboy.com; sportsbook.playboy.com; casino.playboy.com; and any other sites at which this Policy appears. It does not apply to other online or offline Playboy sites, products or services.

This Policy explains what information we collect about you and what we do with it. We reserve the right to modify this policy at any time, and we will post any new policy here. By using or navigating any of the Sites, you acknowledge that you have read, understand and agree to be bound by this Policy or any modified Policy as posted. If you do not agree to these terms, please do not use or visit any of our Sites.

## What information do we collect?

We collect personal information that you provide to us such as your name, e-mail address, street address and telephone number. We also collect credit card information from you. We generally collect this personal information on our registration and order forms when you sign up to receive products or services from any of our Sites. We may also collect information from our online surveys such as age, gender and income level. Finally, we collect IP addresses and anonymous demographic information.

## What do we do with the information we collect?

We use personal information and other demographic or profile information you provide to us to fulfill your order or request; to provide you with information about Playboy and some of our partners; and to contact you when necessary.

We use IP addresses and anonymous demographic information to tailor your experiences at our Sites by showing content in which we think you will be interested and displaying content according to your preferences. Anonymous demographic information is shared with advertisers and market researchers on an aggregate basis.

We use information collected to evaluate and improve our services. We may develop and use, in our sole discretion, consumer research which may be based on your use of our services.

Personal information collected on the Sites is stored and processed in the United States and by using this site, you consent to any such transfer of information outside of your country.

## Do we share the information we collect with third parties?

In some cases, we will share information we collect (including personal information or anonymous demographic information) with third party companies who may offer products or services in which we believe you may be interested. We also share this information with third parties with whom we partner to co-promote and administer sweepstakes and contests on our Sites. You may elect not to receive promotional e-mails from us or other companies we select by choosing one of the unsubscribe options described below.

We may also share information we collect with third party service providers to manage certain aspects of the services we provide, such as maintaining our servers and processing or fulfilling orders for products and services you purchase through the Sites.

We may also disclose your information in special cases if required to do so by law, court order or other governmental authority or when we believe in good faith that disclosing this information is otherwise necessary or advisable, including, for instance, to identify, contact, or bring legal action against someone who may be causing injury to or interfering with the rights or property of Playboy, another user or anyone else that could be harmed by such activities.



31



is the information submitted in public forums confidential?

No. The Sites may offer chat rooms, forums, message boards and/or news groups to our users. Please remember that any information disclosed in these areas becomes public information. Accordingly, you should exercise caution when deciding to disclose your personal information and you do so at your own risk.

Do we use cookies?

Yes. Cookies are pieces of information generated by web servers and stored in your computer for future access. The Sites use cookie technology to enhance your online experience by making it easier for you to navigate through our Sites or make a feature work better. Generally, cookies can be disabled. However, you must accept cookies in order to navigate the Sites; register for our membership Sites and order products from our online stores.

Do we use web beacons?

Yes. Some of our Sites may contain electronic images known as "web beacons" or single-pixel gifs that allow us to count visitors to our Sites and deliver co-branded services. Web beacons collect limited information including cookie number, time and date of a page view and a description of the page on which the web beacon resides.

Are the Sites secure?

We are committed to maintaining the security of your information and have measures in place to protect against the loss, misuse and alteration of the information under our control. All credit transactions occur in a secure area of the Site using Secure Sockets Layer ("SSL") software to process orders. SSL encrypts the information you input on the Sites. In addition, all information is stored in a secure location behind a firewall with limited administrative access.

Does this Policy apply to linked sites other than the Sites?

No. The Sites contain links to other Internet sites, resources and sources of Playboy. By clicking on an ad banner or other link, you will be redirected off the Sites and to third party websites. Playboy is not responsible for the privacy policies of such sites. You should make sure that you read and understand the privacy policies of these sites and direct any concerns regarding external links to the site administrator or webmaster of that third party website.

How do I unsubscribe?

All e-mails you receive from us will include specific instructions on how to unsubscribe and you may unsubscribe at any time. Additionally, we give you the following options for removing your information from our database:

(1) send an email to admin@playboy.com;

(2) select the opt-out link at the bottom of any Playboy email and follow the instructions provided;

(3) send mail to the following address: Customer Service, Playboy.com, Inc., 680 North Lake Shore Drive, Chicago, IL 60611.

Can I update/correct my information?

Yes. You may correct or update your personal information by sending us an email at pb@playboy.com.



32



2030129_1

## UNACCEPTABLE ADVERTISEMENT CATEGORIES ON E-COMMERCE WEB SITES

SEXUAL AIDS & DEVICES (TAKEN ON A CASE-BY-CASE BASIS)
Dildos
Vibrators - if implied use is sexual
Creams and ointments - that increase pleasure or claim to extend tumescence, etc.

EXPLICIT SEXUAL MATERIAL
X-Rated videos
X-Rated audio cassettes
Sexually oriented telephone services
Explicit sex books
Suggestive T-shirts
X-Rated clothes (i.e., candypants)
Adult entertainment nightclubs and cabarets

MEDICAL
Growing new hair (including transplants) (TAKEN ON CASE-BY-CASE BASIS)
Hypnotism (i.e., stop smoking, lose weight)
Breast/Penis enlargement
Super vitamins with unsubstantiated claims
Condoms - if copy is suggestive
Aphrodisiacs
Inhalants (i.e., amylnitrate)
Weight reducers
Hemorrhoid remedies

SELF-IMPROVEMENT/BEATING THE ODDS
Betting services
Books on cheating (cards, IRS, etc.)
Lotteries
Home study courses

DRUG PARAPHERNALIA
All items including rolling papers

WEAPONS
Hand guns
Switchblade knives

SUGGESTIVE NAMES
No drug related product names unless the description of the product's use is clear.

COMPARISON ADVERTISING
Aggressive competitive ads that might create a problem with other advertisers.
Aggressively competitive claims which are not substantiated.

MISCELLANEOUS
No PLAYBOY name or logo without permission
No Nazi or anti-Semetical paraphernalia
No ads for competitive publications such as *Maxim, FHM, Stuff, CKM, Hustler* or *Penthouse*
All mail-order must include a money-back guarantee





## SCHEDULE 6 – ROYALTIES

Distributor will pay the Company (i) the Minimum Royalty as set forth below or, (ii) if higher, the Earned Royalties. **The "Earned Royalties" will be equal to USD$3.00 per case (24-250ml cans of Energy Drinks)** or USD$0.125 per can sold based on Net Sales and $4.00 per case (24-500ml cans of Energy Drinks or 24-62ml bottles of Energy Shots) or USD$0.167 per can/bottle sold based on Net Sales.

For the first contract year, the Minimum Royalty of USD$500,000 will be paid as follows: USD$250,000 within two (2) business days after signing of this Agreement and balance of USD$250,000 no later than 90 days after signing of this Agreement. The confirmation of payments will be sent to the Company at the address and or fax number provided in Section 12.5, or by other means as agreed by the parties. The Company may terminate the Agreement, without written Notice to Distributor, if any of the wires is not received when due and shall retain any and all amounts previously paid by Distributor to the Company as reasonable liquidated damages.

Beginning with the second contract year, Distributor will pay the Minimum Royalty for each year in advance, on or before the first day of such contract year.

Minimum Royalty:

| Contract Year | Minimum Payment |
|---|---|
| First Year | US$500,000 |
| Second Year | US$600,000 |
| Third Year | US$700,000 |
| Fourth Year | US$800,000 |
| Fifth Year and each subsequent year | US$900,000 |





## SCHEDULE 7 - USE OF TRADEMARKS

The following rules for usage must be followed wherever possible with respect to all Trademarks:

- In every instance where a Trademark is printed, the ® symbol shall be used as a superscript at the end of the Trademark, to notify the reader that its use is proprietary.

- The Trademark must not be used on a stand-alone basis or as a noun or verb, but only as an adjective in connection with the generic name for the product or service; e.g., Playboy® energy drink.

- The Trademark must not be used in any manner that may suggest directly or indirectly that Licensee or any other person is endorsed or operated by Playboy or the Company.

- If possible, in advertisements using the Trademark, a statement such as the following is desirable and helpful: "[TRADEMARK] is a registered trademark of Playboy Enterprises International, Inc. Used under license."

- The Trademarks must be used specifically for the merchandising and the sale of approved Products only.

- The Trademarks shall not be combined with any other trademarks.

- The spelling of Trademarks shall not be changed.

- Trademark logos must preserve the look and feel of the sample provided by the Company. Logos may not be distorted, re-colored, slanted, changed to a different typeface, or otherwise altered or modified (other than making the entire logo larger or smaller to fit available space, without altering its internal proportion or look). Trademarks other than logos are not font specific and may be used in fonts consistent with the document in which they are included.

- A sample of each use of the Trademarks must be provided to the Company for review and approval by the Company and/or Playboy, pursuant to the terms of the Agreement.





35

15) The Company has appropriately reconciled its general ledger accounts to their related supporting information. All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the financial statements. All intracompany (and intercompany) accounts have been eliminated or appropriately measured and considered for disclosure in the financial statements.

16) The Company does not owe the PCAOB outstanding past-due accounting support fees.

17) The Company is still the primary beneficiary of Play Beverages, LLC.

18) The Company intends to hold its investment in Broaddata long term and has determined the cost basis is still a valid basis of accounting.

19) The Company does not consider it necessary to accrue for $267,296 of legal claims for Durham, Jones & Pinegar which were asserted as owing at December 31, 2011.

20) We have provided you all contracts, agreements, notes and litigations documents.

21) All related party transactions are properly recorded in the financial statements.

Except as disclosed in Note 24 to the financial statements, no events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

_____  
Iehab Hawatmeh, President, CEO and CFO

April 16, 2012  
_____  
Date

_____  
Kathryn Hollinger, Controller

4/16/12  
_____  
Date

EXHIBIT B

# AMENDMENT 1
## To
## Manufacturing and Distribution Agreement

This Amendment 1 (the "Amendment") dated effective as of February 13, 2013 (the "Effective Date"), is by and between CirTran Beverage Corp., a Utah corporation located at 4125 South 6000 West, West Valley City, UT 84128, USA (the "Company") and Play Beverages, LLC ("Play Beverages"); and **Noble Gate Industrial (Shenzhen) Co., Ltd.** with its principal place of business at 3206 Building #2 Zhongshan Garden, Huli Rd., Shenzhen, China (the "Distributor"). This Amendment modifies and amends the terms of the Manufacturing and Distribution Agreement (the "Agreement") between the parties, dated June 1, 2012. All capitalized terms used and not otherwise defined in this Amendment shall have the meanings given to such terms in the Agreement.

The parties agree to amend the Agreement as follows:

1.  The Effective Date is changed to April 1, 2013.

2.  The Agreement is amended to include Playboy Energy Drink in all sizes.

3.  The following will be changed in Schedule 6:

    **Add:** Distributor will also pay the Company (i) the Minimum Royalty for Water and Flavored Water as set forth below or, (ii) if higher, the Earned Royalties. **The "Earned Royalties" for Water and Flavored Water sales will be equal to USD$0.0625 per bottle sold based on Net Sales.**

    Distributor's Minimum Royalty payment for Water and Flavored Water for the first contract year for the Territory is USD$100,000 and will be paid at time of signing of this Amendment. Beginning with the second contract year, Distributor will pay the Minimum Royalty for Water and Flavored Water for each year in advance, on or before the first day of such contract year.

    In addition, the Company will issue a credit of USD$250,000 toward the Minimum Royalty payment for the First Contract Year starting April 1, 2013 and the Balance of USD$250,000 will be paid as follows: USD$50,000 will be due at time of signing and balance of $200,000 will be paid no later than March 29, 2013. If any of the payments are not received when due, the Agreement terminates and Company retains all payments made as part of its liquidated damages.

    Minimum Royalty for Water and Flavored Water:

| Contract Year | Minimum Payment |
| --- | --- |
| First Year | US$100,000 |
| Second Year | US$150,000 |
| Third Year | US$150,000 |
| Fourth Year | US$200,000 |
| Fifth Year | US$250,000 |
| Six Year and each subsequent year | US$250,000 |

1

To make it clear, the Minimum Royalty for Water and Flavored Water is in addition to the Minimum Royalty Payment mandated in the Agreement Dated June 1, 2012.

4.    Attachment 1 to Schedule 2 is amended to add the following for Water and Flavored Water.

# Noble Gate
Minimum Volume for Water and
Flavored Water
Attachment 1 to Schedule 2 for
Water and Flavored Water

| Contract Years | Territory In Millions/ Bottles | TOTAL Minimum Sales/million bottles Per License Year | CirTran Royalty per million bottles (USD) | CirTran Royalty Minimum per Licensed Year | Upfront Minimum Royalty for License |
|---|---|---|---|---|---|
| First Year | 2.4 | 2.4 | $ 62,500 | $ 150,000 | $100,000 |
| Second Year | 3.2 | 3.2 | $ 62,500 | $ 200,000 | $150,000 |
| Third Year | 4.0 | 4.0 | $ 62,500 | $ 250,000 | $150,000 |
| Fourth Year | 4.8 | 4.8 | $ 62,500 | $ 300,000 | $200,000 |
| Fifth Year | 5.6 | 5.6 | $ 62,500 | $ 350,000 | $250,000 |
| Sixth Year | 6.4 | 6.4 | $ 62,500 | $ 400,000 | $250,000 |
| Seventh Year | 6.4 | 6.4 | $ 62,500 | $ 400,000 | $250,000 |
| Eighth Year | 7.2 | 7.2 | $ 62,500 | $ 450,000 | $250,000 |
| Ninth Year | 8.0 | 8.0 | $ 62,500 | $ 500,000 | $250,000 |
| Tenth Year | 8.0 | 8.0 | $ 62,500 | $ 500,000 | $250,000 |
| TOTAL (000 Cases) | 56 | 56 | | $ 3,500,000 | $2,100,000 |

Except as amended hereby, all terms and conditions of the Agreement shall remain in full force and effect.
IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

ECBW

**APPROVED:**

**COMPANY:**                                    **DISTRIBUTOR:**

CIRTRAN BEVERAGE CORP.                NOBLE GATE INDUSTRIAL (SHENZHEN) Co.,
                                                              LTD

By: _____            By: _____
   Name: Iehab J. Hawatmeh                   Name: Walid El-Badaoui

   Title:  President                                     Title:  DIRECTOR

Date: _13 - 02 - 2013_                        Date: _13 - 02 - 2013_

PLAY BEVERAGES, LLC

By: _____
   Name: Fadi Nora
   Title: Manager

Date: _02. 13. 2013_

2